## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| **JIMMY DOYLE HINDMAN,** ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| **v.** ) | **5:06-cr-00112-KOB-JEO** |
| ) | **5:10-cv-08023-KOB-JEO** |
| **THE UNITED STATES OF** ) | |
| **AMERICA,** ) | |
| ) | |
| Respondent. ) | |

## <u>MEMORANDUM OPINION</u>

The cases referenced above are before the court on the motion of petitioner Jimmy Doyle

Hindman, to vacate, set aside, or correct his federal conviction and sentence pursuant to 28

U.S.C. § 2255. (Civ. Doc. 1, Crim. Doc. 153).[1]  Upon careful consideration, the court finds no

need for an evidentiary hearing and that the motion is due to be denied.

## I. BACKGROUND

### A. Procedural History

On March 29, 2006, the Grand Jury issued a multi-count indictment against Hindman,

charging him in Counts One and Three with armed bank robbery, in violation of 18 U.S.C. §§

2113(a) and (d).  (Crim. Doc. 2).  Counts Two and Four charged him with brandishing a firearm

during the robberies, in violation of 18 U.S.C. § 924(c)(1)(A).  (*Id*.).  This court determined that

---

[1]References herein to "Civ. Doc(s). ___" are to the document numbers assigned by the Clerk of the Court in the present § 2255 civil case (*Hindman v. United States*, 5:10-cv-08023-KOB-JEO (N.D. Ala.)). References herein to "Crim. Doc(s). ___" are to the document numbers assigned by the Clerk of the Court in the defendant's underlying criminal case (*United States v. Hindman*, 5:06-cr-0112-KOB-JEO (N.D. Ala.)). Unless otherwise noted, pinpoint citations are to the page of the electronically filed document, which may not correspond to pagination on the original "hard copy."

Hindman could not afford to retain an attorney and, therefore, appointed attorney J. Brice Callaway to represent him on April 7, 2006.  (Crim. Docket Entry dated April 7, 2006).

Mr. Callaway filed several motions for disclosure of various documents and for disclosure of promises of favorable treatment to government witnesses and for prior bad act evidence (Fed. R. Evid. 404(b)) from the United States.  (Crim. Docs. 6, 12 & 13).  He also filed a motion for expert services to conduct DNA testing.  (Crim. Doc. 17). On July 10, 2006, the petitioner requested new representation via a letter request.  (Crim. Doc. 21).  The magistrate judge conducted a hearing, and the court appointed Mr. David Luker to represent the petitioner. (Crim. Docket Entry dated July 24, 2006).

The government filed a superseding indictment August 1, 2006.  The Grand Jury again issued a multi-count indictment charging Hindman in Count One with the interstate transportation of a stolen motor vehicle, in violation of 18 U.S.C. § 2312; in Counts Two and Four with armed bank robbery, in violation of 18 U.S.C. §§ 2113(a) and (d); and in Counts Three and Five with brandishing a firearm during the robberies, in violation of 18 U.S.C. § 924(c)(1)(A).  (Crim. Doc. 24).  The Government also charged defendant Billy Don Harvey in Counts Four and Five.  (*Id*.).  Harvey eventually entered a plea of guilty to the charges on September 18, 2006, pursuant to a plea agreement.  (*See* Crim. Doc. 47; Crim. Docket Entry dated September 18, 2006).

Mr. Luker filed another motion on Hindman's behalf, seeking disclosure of prior act evidence, impeachment evidence, promises of immunity, disclosure of *Jencks*[2] material, and statements the United States intended to attribute to Hindman.  (Crim. Docs. 32-36).  The court granted the motions.  (Crim. Docket Entry dated August 30, 2006).  Mr. Luker also filed motions

---

[2]*See* The Jencks Act, 18 U.S.C. § 3500; *Jencks v. United States*, 353 U.S. 657 (1957).

to suppress the identification of the petitioner by a witness, as well as evidence seized in a previous search.  (Crim. Docs. 41 & 48).  He then filed a notice of alibi as to petitioner Hindman.  (Crim. Docs. 49 & 54).  Finally, he filed a motion for funds to retain an investigator.  (Crim. Doc. 55).

The court conducted a hearing on Hindman's motions to suppress.  Thereafter, the magistrate judge recommended that the motions be denied.  (Crim. Doc. 56).  No objections were filed.  The court adopted the recommendation of the magistrate judge and denied the motions.  (Crim. Docs. 60 & 61).

On October 23, 2006, Hindman filed a motion to dismiss the counts of the indictment charging him with brandishing firearms during the two enumerated robberies.  (Crim. Doc. 57).  The court denied the motion, but required the United States to file a bill of particulars specifying the dates and locations of the robberies during which the firearms were brandished.  (Crim. Doc. 59).  Hindman further filed a motion for issuance of subpoenas and for funds for medical and forensic experts.  (Crim. Docs. 63, 65 & 81).  The court granted those motions.  (Crim. Docket entry dated December 12, 2006).

On November 17, 2006, Hindman requested new counsel a second time.  (Crim. Doc. 71).  The court granted the motion following a hearing, and appointed Mr. P. Russell Steen to represent the petitioner.  (Crim. Doc. 72).  Hindman filed various *pro se* motions and again sought new counsel.  (Crim. Docs. 82-84, 87, 97).  Following a hearing, the court appointed new counsel, Mr. Rick Burgess, to represent Hindman.  (Crim. Docket entry dated January 23, 2007).

Trial commenced on February 12, 2007, and the jury convicted Hindman on each count of the indictment on February 15, 2007.  (Crim. Doc. 119).  Thereafter, he filed various *pro se* motions.  The court informed him that he could not file such motions while he was represented

by counsel.  (Crim. Doc. 128).  Hindman filed yet another motion to dismiss counsel on August 7, 2007.  (Crim. Doc. 129).  Following a hearing in August 2007, the court denied the motion. (Crim. Doc. 130).

The United States Probation Office prepared a Presentence Investigation Report on Hindman.  (Crim. Doc. 132 (Sealed)).  On September 25, 2007, this court held a sentencing hearing and sentenced Hindman to 70 months in prison as to Counts One, Two & Four to run concurrent, 120 months as to Count Three, and 300 months as to count Five, each term to run consecutive.  (Crim. Doc. 134).  The custodial sentence is to be followed by 60 months of supervised release.  (*Id*.)

Mr. Burgess timely filed a notice of appeal on Hindman's behalf.  (Crim. Doc. 135).   He also filed a motion to withdraw as counsel.  (Crim. Doc. 136).  The court granted the motion to withdraw and appointed new counsel, Mr. Michael Rasmussen, to represent Hindman on direct appeal.  (Crim. Doc. 138).  In the Eleventh Circuit, Mr. Rasmussen raised a challenge to the sufficiency of the evidence concerning whether the deposits of the bank branches that were robbed were insured by the Federal Deposit Insurance Corporation.  He also challenged this court's instruction to Hindman on the potential hazards of presenting character witnesses during trial.  (Crim. Doc. 150 at 3).  On July 1, 2008, the Eleventh Circuit affirmed Hindman's conviction and sentence.  (*Id*.); *United States v. Hindman*, 284 F. App'x 694 (11th Cir. 2008). That mandate was entered on September 24, 2008.  (Crim. Doc. 150 at 1).  Hindman's *pro se* petition to the United States Supreme Court for a writ of certiorari was denied on May 12, 2009. (Crim. Doc. 151); *Hindman v. United States*, 556 U.S. 1227 (2009).

On May 6, 2010, Hindman filed a petition to vacate his conviction and sentence pursuant to § 2255.  (Civ. Doc. 1).  That motion is 305 pages long, includes another 380 pages of

attachments, and asserts forty-one "grounds" for relief, many of which include various subclaims. (*Id*.; Civ. Docs. 1-1 through 1-21).  On July 16, 2010, Hindman filed an amendment to his motion by which he supplemented his arguments on three of his grounds for relief.  (Civ. Doc. 12).  The United States responded with its own 51-page memorandum in opposition that included several exhibits, including an affidavit from Hindman's counsel at trial, Burgess.  (Civ. Doc. 13). On April 25, 2011, Hindman filed another 349-page evidentiary submission.  (Civ. Doc. 20).  On April 16, 2012, Hindman filed a reply to the opposition materials filed by the United States. (Civ. Doc. 28).

Hindman also filed various requests for discovery and for an evidentiary hearing (Civ. Docs. 5-10, 20, 21 & 23), most of which the court denied.  (Civ. Docket Entry dated March 28, 2012).  Hindman then filed an "Interlocutory Appeal" with the Eleventh Circuit Court of Appeals.  (Civ. Doc. 25).  He also filed a motion to reconsider the denial of relief.  (Civ. Doc. 26).  This court denied Hindman's request to proceed on appeal *in forma pauperis* (Civ. Doc. 31), and the Court of Appeals dismissed the appeal for lack of jurisdiction.  (Civ. Doc. 32).  The court thereafter granted in part and denied in part Hindman's motion for reconsideration.  (Civ. Doc. 33).  He filed another notice of appeal (Civ. Doc. 35), but the Court of Appeals also dismissed for lack of jurisdiction.  (Civ. Doc. 40).  The Court of Appeals subsequently denied his motions for reconsideration.  (Civ. Doc. 42 & 43).

Hindman filed a motion seeking the recusal and/or disqualification of both the undersigned district judge and the referral magistrate judge from further consideration of his § 2255 motion.  (Civ. Doc. 39).  The court denied that motion.  (Civ. Doc. 44).  Hindman once again filed a notice of appeal, this time as to the denial of his motion for recusal.  (Civ. Doc. 45). The Eleventh Circuit dismissed that appeal *sua sponte* for lack of jurisdiction on January 21,

2014.  (Civ. Doc. 50).

The § 2255 motion case is now ripe for disposition.


**B.  Offense Conduct**

On direct appeal, the Eleventh Circuit Court of Appeals summarized the trial evidence, as

follows:

> Pursuant to the indictment, the bank-robbery charges stemmed from Hindman's August 1, 2003, robbery of the Dekalb Bank of Sand Rock, Alabama, and August 12, 2005, robbery of the Community Bank of Elkmont, Alabama.
>
> At Hindman's jury trial, Billy Richard May, Jr., a codefendant of Hindman's previously convicted for his role in the offense, testified for the government that on August 1, he and Hindman robbed a bank in Sand Rock.  The bank was a "small country bank in a real rural area."  May traveled to the bank in a car that he had stolen, at Hindman's directions, for that purpose.  Hindman traveled to the bank in another, non-stolen car.  Shortly before reaching the bank, Hindman parked the non-stolen car behind an abandoned trailer and rode the remainder of the way with May in the stolen car.  Each man wore masks and carried two guns.  They arrived at the bank minutes after it had opened, before any customers had arrived.  During the robbery, May's job was to "watch the door" and parking lot to ensure that the police did not arrive.  Hindman's job was to collect money from the bank teller drawers.  After Hindman had collected all of the money, he and May drove back to the abandoned trailer in the stolen car, left it, got into the non-stolen car, and drove into the woods.  There, May took the guns and money and hid in the woods.  Hindman drove the rest of the way home, left the non-stolen car, got into a different car, returned to the woods, and retrieved May and the guns and money.
>
> The government submitted security camera pictures taken of the bank on the morning of August 1.  May identified himself standing near the door and Hindman taking money from bank teller drawers.
>
> ....
>
> Billy Harvey, a codefendant of Hindman's previously convicted for his role in the offense, testified for the government that, on August 12, he and Hindman robbed a bank in Elkmont.  Before that day, Hindman took Harvey to a bank in Sand Rock and told Harvey that Hindman and May had robbed that bank before.  On August 12, Harvey traveled to the bank in a stolen car that Hindman had provided.  Hindman traveled to the bank in a green car.  Just before they reached the bank,

Hindman parked the green car on the side of a dirt road and rode the remainder of the way with Harvey in the stolen car. Hindman brought guns. Each man wore masks. They arrived at the bank minutes after it had opened, before any customers had arrived. During the robbery, May's job was to collect the money. After the robbery, Hindman's plan involved driving the stolen car with Harvey back to the dirt road where the green car was parked, getting in the green car with Harvey, driving into the woods and dropping off Harvey and the guns and money, returning home alone, getting in a different car, and returning to the woods that night to retrieve Harvey and the guns and money. However, the police saw Hindman and May fleeing the bank, and a chase ensued.

Donnie Jones, a police officer with the Elkmont Police Department, testified for the government that, in the course of the police chase, Hindman got ahead of the police, abandoned the green car, and disappeared. Jim Landers, a police officer with the Sheriff's Office of Limestone County, which encompasses Elkmont, testified for the government that, upon searching the vicinity of the abandoned green car, the police found masks, gloves, and ammunition. Heather Seubert, a DNA examiner with the Federal Bureau of Investigation, testified for the government that she found a match between DNA found on a mask collected by the police officers in the vicinity of the green car and DNA provided by Hindman.

....

(Crim. Doc. 150 at 4-7); *Hindman*, 284 F. App'x at 695-96. Testimony at trial also established that, several days before the Elkmont robbery, Hindman was given the green car to do mechanical work on it. (R.[3] 220).

## II.   ANALYSIS

### A.   Legal Guideposts

#### 1.   Section 2255 Motions Generally

Section 2255 provides that a prisoner in federal custody may move the court which imposed sentence to vacate, set aside or correct the sentence if it was imposed in violation of federal constitutional or statutory law, was imposed without proper jurisdiction, is in excess of the maximum authorized by law, or is otherwise subject to collateral attack. 28 U.S.C. § 2255.

---

[3]Citations to "R. ___" are to the page of the reporter's transcript of Hindman's trial. (*See* Crim. Doc. 143 (R. 1-190), Crim. Doc. 144 (R. 191-401), Crim. Doc. 145 (R. 402-600), Crim. Doc. 146 (R. 601-606)).

If a court finds a claim under § 2255 to be valid, then the court "shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate." *Id.* To obtain this relief on collateral review, however, a defendant must "clear a significantly higher hurdle than would exist on direct appeal." *United States v. Frady*, 456 U.S. 152, 166 (1982) (rejecting the plain error standard as not sufficiently deferential to a final judgment).

Unless "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief," the court shall "grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." § 2255. The Eleventh Circuit Court of Appeals has explained that "[a] habeas corpus petitioner is entitled to an evidentiary hearing on his claim 'if he alleges facts which, if proven, would entitle him to relief.'" *Smith v. Singletary*, 170 F.3d 1051, 1053 (11th Cir. 1999) (quoting *Futch v. Dugger*, 874 F.2d 1483, 1485 (11th Cir. 1989)). However, "if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007).

### 2. Procedural Default

The United States contends that Hindman is procedurally barred from presenting many of his claims because they could have been but were not raised on direct appeal. *See McCoy v. United States*, 266 F.3d 1245, 1258-59 (11th Cir. 2001). A § 2255 motion cannot substitute for a direct appeal. *Burke v. United States*, 152 F.3d 1329, 1331 (11th Cir. 1998). Accordingly, claims that were not presented on direct appeal but could have been are defaulted and cannot serve as the basis for relief under § 2255 unless such default is excused. *See Brown v. United States*, 720 F.3d 1316, 1332-33 (11th Cir. 2013). The same is generally true of a claim that could

have been, but was not, properly raised and preserved in the trial court.  *See Reece v. United States*, 119 F.3d 1462, 1467-68 (11th Cir. 1997).

To overcome this procedural bar, Hindman must establish cause for the default *and* actual prejudice resulting from the default.  *See Mills v. United States*, 36 F.3d 1052 (11th Cir. 1994) (*per curiam*).  To establish "cause" for a procedural default, a defendant must show that some "objective factor external to the defense" prevented the defendant or his counsel from raising his claims on direct appeal and that this factor cannot be fairly attributable to the defendant's own conduct.  *Lynn v. United States*, 365 F.3d 1225, 1235 (11th Cir. 2004).  Ineffective assistance of counsel, as Hindman raises here, *may* constitute cause to excuse procedural default.  *See Eagle v. Linahan*, 279 F.3d 926, 937 (11th Cir. 2001).  And as to actual prejudice, Hindman "shoulder[s] the burden of showing, not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."  *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original).[4]

The Eleventh Circuit has also indicated that a defendant may establish cause for a procedural default by showing that new evidence has given rise to a claim that was unavailable at the time of the prior proceedings.  *See Lynn*, 365 F.3d at 1235.  However, in such circumstances, the defendant must show that the claim at issue was not available at all at the time of the prior

---

[4]In an "extraordinary" case, a federal court may also consider a procedurally-defaulted claim in the absence of a showing of cause for the procedural default where a fundamental miscarriage of justice has "'probably resulted in the conviction of one who is actually innocent.'" *Smith v. Murray*, 477 U.S. 527, 537 (1986) (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).  "To establish actual innocence, [a petitioner] must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." *Bousley v. United States*, 523 U.S. 614, 623 (1998) (internal quotations marks and citation omitted).   Hindman, however, has not argued that the evidence demonstrates that he is actually innocent, and the materials in the record plainly refute the validity of any such claim.

proceedings, *id.*, and that the newly discovered evidence satisfies five requirements:

> (1) the evidence was discovered after trial, (2) the failure of the defendant to discover the evidence was not due to a lack of diligence, (3) the evidence is not merely cumulative or impeaching, (4) the evidence is material to issues before the court, and (5) the evidence is such that a new trial would probably produce a different result.

*Id.* at 1237 (quoting *United States v. Jernigan*, 341 F.3d 1273, 1287 (11th Cir. 2003)).

### 3.   Ineffective Assistance of Counsel

The Sixth Amendment affords a criminal defendant the right to "the Assistance of Counsel for his defence."  U.S. Const. amend VI.  "It has long been recognized that the right to counsel is the right to effective assistance of counsel."  *McMann v. Richardson*, 397 U.S. 759, 771 n. 14 (1970); *see also Cuyler v. Sullivan*, 446 U.S. 335, 344 (1980).  A defendant can establish a claim of ineffective assistance of counsel upon a showing that the (1) "counsel's performance was deficient," *and* (2) "that the deficient performance prejudiced the defense" because the "errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  In a habeas corpus action, the petitioner generally carries the burden to establish both components.  *Lawhorn v. Allen*, 519 F.3d 1272, 1293 (11th Cir. 2008) (citing *Atkins v. Singletary*, 965 F.2d 952, 958-59 (11th Cir. 1992)).

The Eleventh Circuit has explained:

> To establish a constitutionally deficient performance, the defendant must "identify the acts or omissions ... that are alleged not to have been the result of reasonable professional judgment" to "show that counsel's representation fell below an objective standard of reasonableness" and "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 687, 690.  The "highly deferential" reviewing court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *id.* at 689, and recognize that cases warranting the grant of habeas relief based on an ineffective assistance claim "are few and far between." *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc) (quotation and citation omitted). ... "[T]he defendant must overcome the

10

> presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Strickland*, 466 U.S. at 689. ... Because "it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight," *Bell v. Cone*, 535 U.S. 685, 702 (2002), we must make "every effort ... to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689.

*Lawhorn*, 519 F.3d at 1293-94.

Once the petitioner establishes constitutionally-deficient performance, the petitioner generally must also prove prejudice.  To do so the petitioner must convince the court that, but for the counsel's unprofessional errors, a reasonable probability arises that the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.  While a petitioner need not show that counsel's deficient conduct "more likely than not altered the outcome of the case," it is not enough for the petitioner to show that counsel's errors merely had "some conceivable effect on the outcome of the proceeding."  466 U.S. at 693.  A court may decline to reach the performance prong if convinced that the petitioner cannot satisfy the prejudice prong in any event.  *Boyd v. Allen*, 592 F.3d 1274, 1293 (11th Cir. 2010).

### B.     Hindman's Claims

#### 1.     Challenges to the Search Warrant Affidavit (1st Ground)

At trial, testimony established that law enforcement personnel recovered two masks and other items associated with the August 12, 2005, Elkmont bank robbery and that DNA on one of the masks matched Hindman's.  The Hindman DNA exemplar had been collected previously, on April 15, 2005, pursuant to a search warrant issued by the United States District Court for the Eastern District of Tennessee.  The application for that search warrant was made by FBI Special Agent Paul Healy on April 13, 2005, who submitted his affidavit to establish probable cause to

believe that Hindman had participated in two prior bank robberies, neither of which he was charged with in the instant case.  (Civ. Doc. 1-10 at 7-27).  Hindman's "1st Ground" for postconviction relief is comprised of 14 subclaims arising from alleged false statements, omissions, errors, and defects in Healy's affidavit that formed the basis for the search warrant application.  (Civ. Docs. 1-1, 1-2, 1-3, and 1-4 at 1-2).  Such alleged false statements and defects, Hindman claims, rendered the warrant and its resulting search invalid and the seized DNA evidence inadmissible.  Hindman argues that these claims entitle him to have his conviction set aside or, in the alternative, to a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), at which he might contest the allegedly false statements in the search warrant.

### a.      Healy Affidavit

Healy offered his affidavit in support of an application for a warrant to search Hindman's residence at 4610 Norcross Road in Hixson, Tennessee, and to obtain DNA evidence and exemplars to be taken from Hindman's person.  (Civ. Doc. 1-10 at 8-24).  The affidavit itself consists of sixteen pages and contains numerous sources of information.  (*Id.* at 9-24 ("Healy Aff.")).  It begins by describing the armed robbery of the First Bank of Tennessee on February 11, 2005, in Dayton, Tennessee.  According to the affidavit, two subjects entered the bank shortly after it opened, while a third person remained in the "get away vehicle."  (Healy Aff. at 2[5]).  The robbers used long firearms, including "an SKS type rifle and a pump action shotgun."  (*Id.*).  The first subject wore "a black face mask, a hooded sweatshirt with a bulging front pocket, woodland camouflage trousers, work gloves and sneakers."  (*Id.*).  The second subject wore "a black face mask, a dark coat, work gloves and camouflage trousers."  (*Id.*).  Both men were believed to be

---

[5]Citations to "Healy Aff. at ___" are to the pagination on the original hard copy of the Healy Affidavit, which is numbered from 1 to 16 at the bottom center of each page.

wearing "body armor." (*Id*. at 2-3). After the robbery, the subjects fled to the waiting vehicle. The vehicle was recovered approximately two miles away from the bank. The license tag had been removed and the car was wiped clean of fingerprints. The FBI Evidence Response Team recovered numerous hairs, fibers, chewing gum, and a shotgun shell from the car. (*Id*. at 3).

The affidavit also included information concerning the second robbery on April 3, 2003, of the Citizen's Tri-County Bank, Palmer, Tennessee. Three subjects entered that bank brandishing "long firearms," including one described as "an AK-47, SKS, or MAK-90" and two pump action shotguns. (Healy Aff. at 3). The three subjects were fully covered, wearing masks, hats, and camouflage. They fled the bank into a waiting vehicle. That vehicle was recovered less than one mile from the bank with the engine running and the doors left open. (*Id*. at 3-4). The license tag had been removed, and was not recovered. The Evidence Response Team recovered "a discarded cigarette butt with suspected ... DNA." (*Id*. at 4). The cigarette butt was submitted to the FBI lab, which issued a report on January 7, 2005, that male DNA was present. Healy determined from a DNA examiner that the sample could be used for "comparison" with "a suspect in this case." (*Id*.).

Healy identified Hindman as a suspect in these robberies. (Healy Aff. at 5). He stated that his review of FBI files revealed "a similarity with bank robberies conducted by a Soddy Daisy, Tennessee based organization that was active in the 1970's, 1980's and 1990's." (*Id*.). He learned from Soddy Daisy Police Investigator Mike Sneed on April 23, 2003, that Hindman, who had previously been convicted of bank robbery in federal court, was "currently associating with members of ... the organization to include former members ... John Shropshire, David Gray and Micky Berry." (*Id*.). Sneed also told Healy that a cooperating witness had heard that "John Shropshire, Mickey Berry, Bobby Harvey and Ed Harvey were all involved in a recent robbery."

13

(*Id*.).  Soddy Daisy Police Chief Branum also told Healy that former Officer Steve Everett[6] told

him that he was concerned that Shropshire was involved in bank robberies because "Shropshire

ha[d] been without money and recently returned after two weeks out of town with 'rolls' of

cash."  (*Id*. at 5-6).

Healy further related that, two days later, on April 25, 2003, FBI Task Force Officer

Debra Morse interviewed an anonymous Soddy Daisy resident and "concerned citizen" who was

a "lifelong associate of John Shropshire, King Shropshire (deceased), Ed Alley, Jimmy Doyle

Hindman, Larry Smith, Harry Stewart, Billy May and others" in the area.  (Healy Aff. at 6).  The

citizen stated that Billy May and Hindman had come to the citizen's residence over two years

ago, at which time May was in possession of "drugs and a large sum of money."  (*Id*.).  "May

boasted about them 'getting more than $60,000 and that he and Hindman made as much money

as they got in Turtletown.'"  (*Id*.).  Healy noted that a bank robbery had occurred in Turtletown,

Tennessee, on September 1, 2000, which was executed "in a nearly identical manner" to the

Palmer and Dayton robberies he was investigating.  (*Id*.).  The citizen stated that May had also

said that "there is more money in banks at the first of the month and they target banks in rural

areas with little or no police departments."  (*Id*.).  The citizen further described the modus

operandi for such robberies as follows:

> May and his associates would get a hot car or a bad car to commit the crimes.  A
> second car is used as a switch car and the hot car is dumped a few miles down the
> road from the establishment.  After the switch, May is sometimes dropped off in a
> nearby wooded area along with the money and clothing worn by the subjects.  The
> switch vehicle leaves and returns later to pick up May.

(Healy Aff. at 6).  Healy stated that he believed the citizen's description described the events in

the Turtletown, Palmer, and Dayton robberies and that May's description of the robberies "is the

---

[6]Everett had since gone to work for another Tennessee police department.  (Healy Aff. at 5).

method commonly used by the ... Soddy Daisy bank robbery organization." (*Id*. at 6-7).

Two weeks later, on May 14, 2003, Healy talked with Jackie Jones who was in the Hamilton County Jail, on a "domestic violence offense." (*Id*. at 7).  Jones told Healy that

> he used to be part of a group of 40 or so individuals from Soddy Daisy, Tennessee who engaged in armed robberies of various types, including bank robbery.  These individuals included David Lee Smith (deceased), John King, Leland Green, Ed Alley, Gary Holt, Jimmy Doyle Hindman, John Shropshire and Gary Sneed.

(*Id*. at 7).  Jones also opined that Hindman was still robbing banks, "based on the fact that Hindman of late has had funds that do not seem to match his income." (*Id*.).  Jones said he had last seen Hindman the first week of May 2003 and that Hindman had "lots of cash" and had just paid off $15,000 in debts.  (Healy Aff. at 7).  Jones also stated that he was aware that Larry Mincey of Soddy Daisey had been paid $750 for hiding automatic weapons and handguns for Hindman.  (*Id*.).

Healy related that he had conducted a consent search of Billy May's residence in Soddy Daisy on May 15, 2003.  (*Id*.).  That search yielded various rounds of ammunition, which resulted in May, a convicted felon, being prosecuted for unlawful possession.  (*Id.*).  May later pled guilty, and prior to his sentencing, Healy and other law enforcement officials interviewed May in June 2004.  (*Id.* at 7-8).  May declined to provide specific information or testimony against Hindman but stated repeatedly that Hindman "was more dangerous than the FBI could imagine," and May alluded to a "pact" between them not to cooperate with law enforcement against the other.  (*Id.* at 8).  When questioned about various robberies, he did, however, state: "I know what happened . . . .  I was there." (*Id*.).  Because of fear for himself and his family, however, he would not cooperate further unless he was released.  Healy reported in the affidavit that Hindman had been in touch with May and, according to May, he and others were "planning

another one [robbery] soon.  It's the end of the month."  (Healy Aff. at 8).  May further stated that "[Hindman has] got a new group helping him.  Jimmy has two new boys with him now, and they are rough."  (*Id*.).

Healy further stated that, on August 5, 2003, other law enforcement agents interviewed a reliable confidential informant ("CI") who stated that the CI had been in the home of Mitchell "Mickey" Berry in about April 2003 to purchase marijuana.  (Healy Aff. at 8-9).  While there, the CI saw a large sum of money on a bed and overheard some men talking about how they had "switched vehicles and had passed the law while on the way."  (*Id*. at 9).  Healy went to interview Berry on August 27, 2003.  (*Id*.).  As he approached the residence, Berry attempted to flee after his son warned him that the officers were coming.  A search of the Berry residence led to the recovery of a MAK-90 assault rifle, four pistols, shotgun shells, camouflage clothing, ski masks and fishing hats similar to those worn by the men that robbed the Tri-County Bank.  (*Id*. at 9-10).  Berry was arrested on firearms-possession charges premised on his prior felony record.  (*Id.* at 10).  Following a jury trial, Berry was convicted and sentenced to 216 months in prison.  (*Id.*).

Healy interviewed John Shropshire pursuant to a plea agreement on December 17, 2003.  (Healy Aff. at 10).  He informed Healy that during the summer 2003, Hindman used five-and ten-dollar bills to repay a $1,000 loan he owed to Shropshire and that Hindman had told him that the money had come from a bank robbery "over the mountain."  (*Id*.).  Shropshire also stated that Hindman told him that he, Hindman, was robbing banks with Billy May and Mickey Berry.  (*Id*.).  Hindman asked Shropshire if he wanted to make some money with him.  Healy related that "Shropshire advised that he had previously robbed several banks in the 1970's and 1980's with Hindman, Berry, Alley, Harry Stewart, King Shropshire, Green, Gary Hold, and others," who

were part of the "Soddy Daisy Bank Robbery gang" that had been "active since the late 1960's."

(*Id.*).

> Shropshire also stated to Healy that
>
> Hindman robs banks in the same manner on every occasion.  Hindman uses a three or four man crew, they either steal a car or buy a vehicle, use masks and carry heavy weapons, they put several people into the woods with the bank robbery money and guns stuffed in duffle bags, the escape vehicle is abandoned and the last robber departs the area in [a] clean vehicle to return the next day to pick the other robbers and the money out of the woods.

(*Id*. at 10-11).  Shropshire further stated that Hindman frequently rides around looking for banks

to rob and that they were riding around in the summer of 2003 when Hindman "picked out a

bank in Spring City, Tennessee, that he thought was a good one to rob."  (Healy Aff. at 11).

Shropshire also relayed details of an incident in which he, Hindman, Jones, Alley, and

Green "were in a gun fight with the Atlanta Police in the 1970's after being caught robbing the

Big Apple Supermarket."  (*Id*.).  According to Shropshire, they "shot their way out of the store

and to their cars, and engaged in a gunfight with the Police as they made their escape."  (*Id*.).

Shropshire stated that he and Hindman "were also in a car chase with the Georgia State Police in

which [they] shot at and repelled a chasing Police car."  (*Id*.).

Healy relayed that Shropshire also stated that Billy May spoke with him about being

involved with Hindman in bank robberies and that Hindman had told Shropshire he was doing

bank robberies with Mickey Berry.  (Healy Aff. at 11-12).  May told Shropshire that Larry

Mincey accompanied him and Hindman on a robbery the prior year.  (*Id*. at 12).

Healy also interviewed Larry Mincey's son, Jason Mincey, on December 3, 2003, as a

"walk-in complainant to the [Chattanooga FBI Office]."[7]  (*Id*.).  Mincey told Healy that he

---

[7]Larry Mincey was deceased at the time of Jason Mincey's interview with Healy.  (Healy Aff. at 12).

believed his father was involved with Hindman in the robbery of a bank in Turtletown based on a comment his father made when a news clip on the television reported on the robbery. Larry Mincey stated, "they were about to get paid." (*Id*.). Jason also noted that his father bragged that it took the police over a week to find the get away car used in the robbery. (*Id*.). Larry showed Jason the stash of assault rifles Hindman had used in the robbery. (*Id*. at 12-13). Jason Mincey further stated that about this time, Billy May asked Mincey to attend to a wound on May's back that he received when he slid down an embankment after Hindman left him in the woods after the Turtletown robbery. (Healy Aff. at 12). Lastly, Jason stated that his father and Hindman would take long, six to eight hour, drives together. (*Id*. at 13).

Still further, an unidentified, FBI cooperating witness, who had previously supplied information leading to the arrest and conviction in federal court of three individuals, informed Healy in about June 2003 that Shropshire was an associate of Hindman and that they (Shropshire and Hindman) recently were "casing" several banks. (*Id*. at 13). Shropshire approached the witness to participate in a "lick" that "would be worth $500,000." (*Id*.)

Finally, Healy interviewed Amanda Leffew on September 2, 2003, about Mickey Berry. (*Id*. at 14). Leffew told him that Berry and May told her that they had participated in a bank robbery about three months ago and that they were part of a five person group that robbed banks and Bi-Lo stores every three months. (Healy Aff. at 14). Leffew identified a third robber who she identified only as "a white male who drives a thunderbird and lives on Norcross Road in a duplex." (*Id*.). Healy was aware that Hindman drove a Thunderbird and lived in a duplex on Norcross Road. Leffew noted that Berry did not participate in the last robbery and that May viewed the robberies as a "game." (*Id*.). Leffew recalled seeing May with a large "wad" of one hundred dollar bills in August 2003 and has seen him with an SKS rifle and two twenty-four

round clips, a folding stock, and armor-piercing ammunition.  (*Id.*).

### b.    Challenge at Trial

Hindman's trial counsel challenged this affidavit by filing a motion to suppress the DNA evidence derived from the search of his residence and person.  (Crim. Doc. 48).  Specifically, Hindman's counsel argued that the search warrant "was based on hearsay and lacked sufficient corroboration to rise to the level of probable cause."  (*Id.* ¶ 2).  The magistrate judge conducted an evidentiary hearing on the motion to suppress on October 10, 2006.[8]  Agent Healy testified and was subjected to cross examination.  (Crim. Doc. 88).

Following the hearing, the magistrate judge issued a Report and Recommendation, *see* 28 U.S.C. § 636(b), finding Hindman's challenge to the search warrant affidavit to be without merit, concluding that the allegations of the affidavit, considered in totality, were sufficient to establish probable cause.  (Crim. Doc. 56 at 10).  In so doing, the magistrate judge recognized that a search warrant could be properly based on hearsay and rejected defense counsel's efforts to attack Healy's statements as knowingly or recklessly false under *Franks*.  (Id. at 10-11).  Finally, the magistrate judge posited that, even if the affidavit was, in fact, insufficient to make out probable cause, the evidence recovered would still be admissible under *United States v. Leon*, 468 U.S. 987 (1984), because the record demonstrated that Agent Healy acted in good faith.  (Crim. Doc. 56 at 11-12).  No Party filed objections to the Report and Recommendation were filed.  The undersigned district judge adopted the magistrate judge's findings and entered a memorandum opinion and order denying the motion to suppress the seizure of the DNA evidence.  (Crim. Docs. 60 & 61).  Hindman did not present any issue regarding the search on direct appeal.

---

[8]The suppression hearing also involved Hindman's challenge to an identification by Limestone County, Alabama, Sheriff's Deputy Randy King.  Claims related to such identification are addressed later in the text.

(Crim. Doc. 150 at 3).

### c.       § 2255 Challenge

In his 1st Ground, Hindman includes 14 distinct challenges to Healy's search warrant affidavit.  He maintains that it contains numerous false statements, made knowingly or recklessly, and other deficiencies that render the warrant unsupported by probable cause such that the DNA evidence offered against Hindman at trial would have been inadmissible.   Hindman's subclaims are based on the following allegedly false statements, omissions, and defects ostensibly contained in the affidavit:

1.     Healy supposedly stated that informant John Shropshire stated that he robbed several banks with Leland Green "in the 1970's and 1980's" despite the fact that Green had died in 1973 (Civ. Doc. 1-1 at 4-7);

2.     Healy supposedly stated that informant Jackie Jones stated that he robbed banks with Green during the same time period, *i.e.*, "in the 1970's and 1980's," despite Green having died in 1973 (*Id.* at 11-20);

3.     Healy stated that Shropshire related that he, Hindman, Jones, Green, and Ed Alley robbed a Big Apple Supermarket in Atlanta "in the 1970's" during which there was a "shootout" with police when, according to Hindman, the referenced robbery occurred in July 1967; he was not there; the robbery involved only four participants rather than five, and Jones could not have participated because he was allegedly in prison at the time (*Id.* at 22-38);

4.     Healy supposedly stated that Jones stated that he engaged in armed robberies, including bank robberies, with David Lee Smith "in the 1970's and 1980's," which Hindman says could not have happened given the dates that each was in prison (*Id.* at 39-46);

5.     Healy stated that, at the time he and other law enforcement officials interviewed Jones on May 14, 2003, Jones was in custody for a "domestic violence offense" when Jones was actually being held on "very serious charges" of aggravated assault and false imprisonment and he later pled to being a felon in possession of ammunition, for which he received a 188-month federal sentence (*Id.* at 47-54; Doc. 1-2 at 1-2).

6.     Healy concealed material information related to the reliability and

20

credibility of Shropshire and Jones, namely that Healy failed to disclose that Shropshire was engaged in "unlawful drug business" and that Jones had been in custody on charges more serious than a "domestic relations offense" (Civ. Doc. 1-2 at 3-5).

7. The affidavit failed to establish the reliability or credibility of Shropshire and Jones, given that they are "well known by all for their criminal conduct, ... especially in the drug business" (*Id.* at 7-11);

8. Healy made false or misleading statements in the affidavit by suggesting that Hindman's DNA might be compared to that male DNA found on a cigarette butt recovered from an automobile used in connection with the robbery of a bank in Palmer, TN, on April 3, 2003, despite Hindman's allegation that he does not smoke cigarettes and the warrant affidavit did not allege that he was known to smoke (*Id.* at 12-17);

9. Healy supposedly stated that Shropshire stated that he, Shropshire, had robbed several banks with Hindman "in the 1970's and 1980's," which Hindman says would have been "impossible," at least as to the "1980's" allegation, given the records showing the respective dates that Shropshire and Hindman were in prison (*Id.* at 18-28);

10. Healy supposedly stated that Shropshire stated had he, Shropshire, had robbed several banks with Micky Berry in the "1970's and 1980's," when Hindman says that they could not have done so, similarly based on the respective dates that Shropshire and Berry were in prison (*Id.* at 29-31; Doc. 1-3 at 1-6).

11. Healy supposedly stated that Shropshire stated that he, Shropshire, had robbed several banks with Harry Stewart "in the 1970's and 1980's," when Hindman says that they could not have done so, based on the respective dates that Shropshire and Stewart were in prison (Civ. Doc. 1-3 at 7-12);

12. Healy supposedly stated that Shropshire stated that he, Shropshire, had robbed several banks with Ed Alley "in the 1970's and 1980's," when Hindman says that they could not have done so, based on the respective dates that Shropshire and Alley were in prison (*Id.* at 13-18);

13. Healy made false or misleading statements to the effect that, in September 2003, Amanda Leffew had identified defendant Hindman as being involved with Berry and May in robbing banks and Bi-Lo stores in the preceding months, based upon her description of a "white male who drives a Thunderbird and lives on Norcross Road in a duplex," along with Healy's statements that Hindman is a white male who lives in a duplex on Norcross Road (*Id.* at 19-24); and

21

14. Healy failed to provide information sufficient to establish the reliability or credibility of Leffew. (*Id.* at 25; Doc. 1-4 at 1-4).

The United States argues that all of Hindman's subclaims in his "1st Ground" are procedurally defaulted because they either were not properly raised and preserved in the trial court and/or could have been but were not raised on direct appeal. The United States is correct.

Hindman did not raise any appellate issues regarding the search warrant, which would generally prevent him from doing so now. *See Brown*, 720 F.3d at 1333. Further, while Hindman's trial counsel moved to suppress the DNA evidence based on alleged defects in the search warrant, counsel did not make many of the particular arguments Hindman now raises in his § 2255 motion. And even as to the suppression arguments that counsel did make in his motion and before the magistrate judge at the suppression hearing, counsel did not object to the magistrate judge's report recommending that such motion be denied, as required to obtain appellate review of this court's order adopting the magistrate judge's recommendation. *See United States v. Holt*, 777 F.3d 1234, 1257-58 (11th Cir. 2015). Accordingly, all of Hindman's subclaims in his 1st Ground are procedurally defaulted *unless* he can show both (1) cause for the default *and* (2) that he suffered actual prejudice.

Hindman appears to rely on a theory that any procedural default is due to be excused because he has newly discovered evidence to support his claims or on the ground that his counsel was ineffective for failing to argue all of his instant claims. However, the court finds that, as it relates to these claims, Hindman's "newly discovered evidence" does not give rise to cause that might excuse his default because such evidence was available at trial in the exercise of due diligence. *See Lynn*, 365 F.3d at 1235-37. In addition, for the reasons explained below, Hindman cannot overcome his default of any of his 14 subclaims in his "1st Ground," whether he

relies upon new evidence or the alleged ineffectiveness of his attorneys, because, at a minimum, Hindman cannot establish prejudice on any claim.

>   **a.      John Shropshire's Bank Robberies "in the 1970's and 1980's" (1st Ground, Subclaims 1, 9, 10, 11, and 12).**

Five of Hindman's Subclaims in his 1st Ground involve a statement that FBI Agent Healy made in his search warrant affidavit to the effect that, in December 2003, John Shropshire[9] advised in connection with a plea agreement in another case that "he had previously robbed several banks *in the 1970's and 1980's* with Hindman, Berry, Ed Alley, Harry Stewart, King Shropshire, Leyland[10] Green, Gary Holt, and others."  (Healy Aff. at 10 (emphasis and footnote added)).  First, in Subclaim 1, Hindman urges that this statement is demonstrably false in that Shropshire could not have robbed banks "with ... Green" "in the ... 1980's" because Green died in 1973.  Hindman calls this the "Dead Man Issue," and he supports it with a copy of Green's death certificate (Civ. Doc. 1-10 at 4) and a photo of his headstone.  (*Id.* at 6).

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.  Probable cause exists when "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  The probable-cause determination must be made by a neutral magistrate "to insure that the deliberate, impartial judgment of a judicial officer will be

---

[9]Healy's affidavit also makes several references to a "King Shropshire," who was alleged to have died by the time Healy applied for the warrant and was a different person than John Shropshire.  (*See* Healy Aff. at 6, 10).  However, Healy's affidavit only attributes statements to John Shropshire, who will at times be identified here by his last name only; any references to King Shropshire will use his full name.

[10]This individual's name is spelled both "Leland Green" and "Leyland Green" at different points in Healy's affidavit.  (Healy Aff. at 7, 10).

interposed between the citizen and the police, to assess the weight and credibility of the information which the complaining officer adduces as probable cause." *Wong Sun v. United States*, 371 U.S. 471, 481-82 (1963).

Affidavits in support of search warrant applications may be based on hearsay. *Jones v. United States*, 362 U.S. 257, 269 (1960); *United States v. Wuagneux*, 683 F.2d 1343, 1356 (11th Cir. 1982). Moreover, affidavits submitted in support of a search warrant are presumptively valid. *Franks*, 438 U.S. at 171; *United States v. Mathis*, 767 F.3d 1264, 1275 (11th Cir. 2014). Nonetheless, a defendant may challenge the validity of the government's affidavit, but before he is even entitled to an evidentiary hearing on the matter, the defendant must make a "substantial preliminary showing" that an affiant made intentionally false or recklessly misleading statements or omissions *and* further that those statements were necessary to the finding of probable cause. *Franks*, 438 U.S. at 155-56; *United States v. Barsoum*, 763 F.3d 1321, 1328-29 (11th Cir. 2014).

The petitioner's burden in this regard "is not lightly met." *United States v. Arbolaez*, 450 F.3d 1283, 1294 (11th Cir. 2006). Rather,

> the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained.

*Franks*, 438 U.S. 171; *see also Barsoum*, 763 F.3d at 1329; *Arbolaez*, 450 U.S. at 1294.

Hindman now, under *Franks*, effectively seeks to attack Healy's recitation of Shropshire's statement about robbing banks with Green "in the 1970's and 1980's" as false and argues that his counsel should have done so. However, Hindman cannot show deficient

performance or prejudice because he does not even now approach the threshold for an evidentiary hearing concerning what Shropshire actually said to Healy about robbing banks "with" Green "in the 1970's and 1980's." On its face, Shropshire's statement is merely a claim that he himself took part in multiple bank robberies during the 1970's and 1980's and that the other individuals he identified acted as an accomplice in one or more of those robberies. In other words, no one but Hindman thinks that Shropshire was claiming that each and every one of the seven identified accomplices helped him rob banks in the 1970's, and that each and every one also helped him rob more banks in the 1980's. Because Hindman's argument is but a straw man, he fails to show any false or misleading statement or any deliberate or reckless misconduct on Healy's part. Nor can Hindman show that this statement, which served simply as broad background information relating to informant Shropshire's criminal history and associations, was necessary to a determination of probable cause for the search warrant, in light of the other information set forth in Healy's affidavit. This background information was not essential to a finding of probable cause but was offered to show the connection with various associations of Hindman. This claim is due to be denied.

Likewise, in Subclaim 9 of the "1st Ground" Hindman insists that it would have been an "impossibility" for him to have robbed banks with Shropshire "in the ... 1980's," because of the respective periods that each man spent in prison. (Civ. Doc. 1-2 at 18-28). In support, Hindman points to documents that he says show that Shropshire was in Tennessee state prison or federal prison from about November 1975 until April or September 1982 (*see* Appx. B-6, Doc. 1-11 at 12-20) and that Hindman was sentenced in federal court for bank robbery in May 1981 and was in federal custody from at least October 1982 until October 1991 (*see* Appx. B-12, Doc. 1-13 at 23-33).

25

However, contrary to his suggestion, the records Hindman presents do not clearly show the precise dates that he and Shropshire were actually in custody to preclude the possibility that he and Shropshire might have both been free together for at least several months in 1982, thereby allowing that they might have robbed a bank together during "the 1980's."  Even so, Hindman's argument still depends upon his idiosyncratic parsing of Shropshire's statement as suggesting that Shropshire robbed banks with each and every one of his alleged accomplices, including Hindman, both "in the 1970's" and "in the 1980's."  All that the challenged portion of Shropshire's statement reasonably suggests is that he robbed at least one bank with Hindman on at least one occasion during the 1970's or the 1980's.  To that end, even Hindman does not specifically argue, never mind affirmatively establish by documentation, that at no point during the entire decade of the 1970's both he and Shropshire were free at the same time.  And most importantly for purposes of *Franks*, Hindman wholly fails to support that the affiant, Healy, knew or recklessly disregarded that Shropshire's statement might have been false.  Nor can Hindman show that this general background statement was necessary to the finding of probable cause.  Therefore, this claim is also due to be rejected.

Hindman essentially repeats this same exercise in Subclaims 10, 11, and 12, proffering criminal history records for Mickey Berry, Harry Stewart, and Ed Alley, three other individuals with whom Shropshire claimed to have robbed banks "in the 1970's and 1980's." Specifically, Hindman argues in Subclaim 10 that Berry's records show that he "definitely did not rob no (sic) banks in the 1970's" with Shropshire because Shropshire was in prison since before 1970 until November 1971, while Berry allegedly went to prison in July 1971 on an 8-year sentence, and Shropshire was back in prison from November 1975 until 1982.  (*See* Appx. B-6, Doc. 1-11 at 12-20; Appx. B-11, Doc. 1-13 at 16-22).

26

In Subclaims 11 and 12, Hindman similarly contends that Shropshire could not have robbed banks with either Stewart or Allen "in the 1980's."  (Civ. Doc. 1-3 at 7-12).  Hindman asserts that because Shropshire was in prison from 1975 to 1982 and then again from December 1984 until 1991, while Stewart and Allen were both sentenced in a federal court in May 1981, along with Hindman, for robbing a bank in North Carolina, which resulted in federal prison sentences for all three that lasted beyond the close of the decade.  (*See* Appx. B-13, Doc. 1-14).

Even assuming for the sake of argument that the criminal history records could show as much as Hindman claims they do regarding when each man was actually incarcerated, which is doubtful, Subclaims 10, 11, and 12 still fail; they are plagued by the same fundamental problems that doom Subclaims 1 and 9.  That is, Shropshire's statement repeated in Healy's affidavit plainly does not amount to a claim by Shropshire that he robbed banks with Berry, Stewart, and Allen in the 1970's and then robbed more banks with each of those same men in the 1980's.  Rather, Shropshire's statement is simply that he himself robbed banks in the 1970's and 1980's and that Berry, Stewart, and Allen each acted as an accomplice in one or more of the robberies.  Thus, Hindman wholly fails to show any knowing or reckless false or misleading statement by Healy, *or* that the statement in question was necessary to establish probable cause for the search.  These claims lack merit.

### b.   Jones's Armed Robberies "in the 1970's and 1980's" (1st Ground, Subclaims 2 and 4)

Hindman's Subclaims 2 and 4 to his 1st Ground are similar in form to those addressed immediately above but instead attack Healy's affidavit as it relates to what he was told by another named informant, Jackie Jones.  In particular, Hindman takes issue with Healy's statement that Jones

advised that he used to be part of a group of 40 or so individuals from Soddy Daisy,
Tennessee who engaged in armed robberies of various types, including bank robbery.
These individuals included David Lee Smith (deceased), John King, Leland Green,
Ed Alley, Gary Holt, Jimmy Doyle Hindman, John Shropshire and Gary Sneed.

(Healy Aff. at 7).

Hindman argues that these statements by Healy were false on the theory that the

statements amount to a claim by Jones that he engaged in bank robberies with Leland Green and

David Lee Smith during the "1970's [and] 1980's." (Civ. Doc. 1-1 at 11-21, 39-46). In short,

Hindman insists that such statement is false insofar as Jones could not have robbed banks with

Green or Smith during "the 1980's" because (1) Green died in 1973; (2) Jones's state criminal

history records (Appx. B-7, Doc. 1-11 at 21-30) allegedly show he was involved in a "bank

robbery spree" in 1976 that resulted in his incarceration from 1977 to 2000 (Civ. Doc. 1-1 at 41);

and (3) Smith's criminal history records and newpaper accounts (Appx. B-10, Doc. 1-13 at 1-15)

allegedly show that Smith was in the Alabama prison system from 1970 until late 1971 and was

then in the custody in Tennessee from June 1972 until 1991.

These claims are frivolous. A necessary premise of Hindman's argument is that Jones's

challenged statement claims that he committed robberies with Green and with Smith in both "the

1970's and 1980's." However, Jones makes no such claim. Indeed, while Healy related in his

affidavit that *Shropshire* stated generally that he had committed bank robberies "in the 1970's

and 1980's" with certain accomplices (Healy Aff. at 10), the challenged statement by *Jones*,

related in Healy's affidavit three pages earlier, does not identify any particular time frame.

(Healy Aff. at 7). And for his part, Healy's own statements in his affidavit regarding the history

of the "Soddy Daisy Bank Robbery gang" allege only generally that it "has been active since the

late 1960s" (*id.* at 10) and that it continued to operate into "the 1970's, 1980's, and 1990's." (*Id.*

at 5).

Hindman has cut from whole cloth the reference to the "1970's and 1980's" time frame regarding the robberies referenced by Jones and engrafted the reference into Jones's statement, presumably for the sole purpose of highlighting inaccuracies it would create. Moreover, none of the documents that Hindman now presents at all suggest that *Healy* had any reason to know or suspect that Jones did not engage in one or more armed robberies with Green and Smith at some time. So again, Hindman has failed to make even a preliminary showing under *Franks* that Healy knowingly or recklessly made false statements in his affidavit; nor can Hindman show that the statement by Jones regarding his criminal history generally was necessary to the finding of probable cause. Subclaims 2 and 4 of the 1st Ground are due to be denied.

### c. The Big Apple Supermarket Robbery (1st Ground, Subclaim 3)

In Subclaim 3 of Hindman's 1st Ground (Civ. Doc. 1-1 at 22-38), he attacks as false the following statements by Shropshire, relayed in Healy's affidavit:

> Shropshire advised that he along with Hindman, Jackie Jones, Ed Alley, and Leyland Green were in a gun fight with the Atlanta Police in the 1970's after being caught robbing the Big Apple Supermarket. Shropshire stated that they shot their way out of the store and to their cars, and engaged in a gunfight with the Police as they made their escape. Hindman and Shropshire were also in a car chase with the Georgia State Police in which Hindman and Shropshire shot at and repelled a chasing Police car.

(Healy Aff. at 11). Hindman maintains that Healy and Shropshire knew the true facts, yet "knowingly changed and twisted" them to make it appear that Hindman was involved when he was not. (Civ. Doc. 1-1 at 22-23).

Nothing in Hindman's submissions demonstrates that Healy knew or recklessly disregarded that the material in Shropshire's statements above was purportedly false. In

particular, Hindman relies upon a newspaper account and several other documents relating to the robbery of a Big Apple Supermarket in Atlanta on July 21, 1967, a crime for which Alley, Green, and two other men (neither of whom was Hindman, Shropshire, or Jones), were prosecuted.  (*See* Appx. B-9, Doc. 1-12).  Hindman insists that this reported robbery is, in fact, the Big Apple robbery that Shropshire told Healy about.  Hindman also points to Jones's criminal history records, which he says indicate that Jones was in a Tennessee prison in July 1967, meaning he could not have participated in that robbery.  (*See* Appx. B-7, Doc. 1-11 at 30).

Of course, proof that an armed robbery of a Big Apple Supermarket in Atlanta in 1967 does not preclude that there might have been another armed robbery of a Big Apple Supermarket in Atlanta occurred sometime "in the 1970's" might have occurred substantially as Shropshire described.  That is so notwithstanding Healy's admission at the suppression hearing that he was unable to corroborate Shropshire's allegations about a Big Apple robbery does not preclude that possibility.  But even assuming that the newspaper account and other materials unearthed by Hindman do pertain to the Big Apple robbery that Shropshire referenced, none of those documents are enough to attribute knowledge or reckless disregard of any purported material falsity to Healy.

To the extent that Hindman argues generally that Healy had to know the information was false because he represented in the affidavit that he reviewed FBI files concerning the activities of the Soddy Daisy based organization from the 1970's and 1980's, such argument is speculative and wholly unimpressive.  Hindman also fails to establish that Healy's recitation of Shropshire's particular statements related to this single, decades-old robbery, whether it occurred in 1967 or sometime "in the 1970's," had any material impact on the probable cause determination for the search warrant in April 2005.  Hindman is not entitled to relief on this claim.

### d.     Reliability of Jones, Shropshire, and Leffew (1st Ground, Subclaims 5, 6, 7, and 14)

In Subclaims 5, 6, 7, and 14 of Hindman's 1st Ground, he launches attacks on the search warrant affidavit as it relates to statements and omissions by Healy purportedly bearing on the reliability of Jackie Jones, John Shropshire, and Amanda Leffew, whose hearsay statements were recounted by Healy.  First, in his broadest claims here, Hindman argues in Subclaims 7 and 14 that the search warrant was invalid because the affidavit did not contain sufficient information establishing the reliability of Jones, Shropshire, or Leffew.  (Civ. Doc. 1-2 at 7-11; Doc. 1-3 at 25; Doc. 1-4 at 1-4).  In a similar vein, in Subclaims 5 and 6 in and part of Subclaim 14, Hindman argues that Healy misstated or omitted facts related to the criminal records and activities of these same witnesses.  For example, in Subclaim 5 (Civ. Doc. 1-1 at 47-54), Hindman maintains that Healy also falsely represented that Jones gave his statement to police while under arrest for a "domestic violence offense" (Healy Aff. at 7), when, in fact, Hindman says, Healy knew that Jones was being held on "more serious" charges of "aggravated assault" and an offense identified as "false imprisonment" or "especially aggravated kidnapping."  (Appx. B-7, Doc. 1-11 at 22; *see also id.* at 25-27).  Hindman similarly laments in Subclaim 6 that Healy failed to disclose that Shropshire was engaged in "unlawful drug business."  (Civ. Doc. 1-2 at 3-5).  Finally, Hindman complains in Subclaim 14 that Healy failed to adequately present in the affidavit that Leffew was, Hindman says, "well known ... to socialize with known criminals, [engage in] unlawful drug use" and to perform sex acts in front of others for money.  (Civ. Doc. 1-3 at 25, Doc. 1-4 at 1).  Hindman cannot establish prejudice on any of these defaulted claims because they are plainly without merit, as explained below.

In deciding whether to issue a search warrant based upon an affidavit, the magistrate

judge is to "make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and the 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Jimenez*, 224 F.3d 1243, 1248 (11th Cir. 2000) (quoting *Gates*, 462 U.S. at 238); *see also Massachusetts v. Upton*, 466 U.S. 727, 732 (1984).  In this context, the informant's "veracity" and "basis of knowledge" "are not independent," but "are better understood as relevant considerations in the totality of the circumstances analysis that traditionally has guided probable cause determinations: a deficiency in one may be compensated for ... by a strong showing as to the other." *United States v. Brundidge*, 170 F.3d 1350, 1352-53 (11th Cir. 1999) (quoting *Gates*, 462 U.S. at 233).  Likewise, corroboration of an informant's tip through other sources of information reduces the chances of reckless or exaggerating tale, thus providing a substantial basis for crediting hearsay.  *Gates*, 462 U.S. at 244-45; *see also United States v. Martin*, 615 F.2d 318, 324-25 (5th Cir. 1980)[11].  Such corroboration may occur through independent police work that confirms details of an informant's allegations or by creating circumstances under which the informant is unlikely to lie.  *See Brundidge*, 170 F.3d at 1353 & n.1; *United States v. Foree*, 43 F.3d 1572, 1576 (11th Cir. 1995).  Also, where multiple informants or witnesses relate similar accounts of events to police, those consistent statements can serve to corroborate one another in furtherance of establishing the veracity and reliability of the informants and ultimately probable cause.  *See Martin*, 615 F.2d at 326-27; *United States v. Brown*, 370 F. App'x 18, 21-22 (11th Cir. 2010).  Other relevant factors include whether the informant has personal knowledge of the facts he relates, *see United States v.*

---

[11]The decisions of the former Fifth Circuit handed down before October 1, 1981 are binding in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

*Burston*, 159 F.3d 1328, 1334 (11th Cir. 1998), the level of detail provided by the informant, *see United States v. Smith*, 918 F.2d 1501, 1507 (11th Cir. 1990), and whether the informant's statement is against penal interest, *see United States v. Harris*, 403 U.S. 573, 583-84 (1971) (plurality opinion); *Craig v. Singletary*, 127 F.3d 1030, 1045 (11th Cir. 1997) (en banc).

Hindman seems to hint in Subclaims 7 and 14 that the statements of Jones, Shropshire, and Leffew could not contribute to probable cause because Healy's affidavit did not establish the reliability of such individuals by alleging that they had provided police with correct information on criminal activity on prior occasions.   However, while such considerations are relevant to an informant's reliability, the affidavit need not aver in every case that the informant has a proven track record with police insofar as other circumstances may sufficiently demonstrate reliability to support a probable-cause determination.  *See Harris*, 403 U.S. at 581-82; *United States v. Novaton*, 271 F.3d 968, 987 (11th Cir. 2001); *Martin*, 615 F.2d at 324-25.  To that end, the reliability of the statements made by Jones, Shropshire, and Leffew was sufficiently established because (1) some of the statements, in which they admitted to participation in armed robberies or illegal drug use, appear to have been against penal interest; (2) Jones and Shropshire each claimed to have had a relationship with Hindman that might have allowed them to be privy to inculpatory conversations and interactions with him and his criminal confederates; (3) general background statements by Jones and Shropshire regarding Hindman's long history of robbing banks with accomplices from Soddy Daisy were corroborated by each other's accounts, Hindman's prior bank robbery conviction (where his convicted co-defendants in the case included Alley and Stewart), and by the statements of other witnesses and informants identified in Healy's affidavit; and (4) statements by Shropshire, Jones, and Leffew that would establish or tend to support that Hindman had participated in one or more bank robberies in early-to-mid

2003, including one in April 2003 from which police had recovered a cigarette butt that yielded a sample of male DNA, were relatively detailed and were corroborated by each other and the statements of other informants and witnesses identified in Healy's affidavit, including as it related to claims that Hindman and certain of his known associates (and alleged accomplices) were suddenly carrying large amounts of cash and that the robberies were consistent with the particular modus operandi consistently used by the "Soddy Daisy gang."

Hindman argues in Subclaims 5 and 6 and part of Subclaim 14, however, that Healy mislead the court by failing to provide a fully accurate picture of the reliability *vel non* of Jones, Shropshire, and Leffew because the affidavit purportedly misstated and omitted information about the criminal histories and activities of those individuals. The principle flaw in such arguments is that, to the extent that Jones, Shropshire, and Leffew might have be deemed reliable, their reliability would not be because anyone considering Healy's warrant application might have mistaken them for innocents. To the contrary, Healy's affidavit and, indeed, Jones and Shropshire's own statements, made it abundantly clear that both men were armed career criminals who made their statements to law enforcement while in custody under the specter of pending criminal charges. (Healy Aff. 7, 10). As to Leffew, Healy's affidavit implies that she made her statement voluntarily, not while in custody. (*Id.* at 14). Hindman makes no claim that she received any undisclosed promise of favorable treatment or that she had a specific motive to fabricate her story. Despite that, Healy makes clear that Leffew had established relationships with Berry and May; that they were all using methamphetamine when Berry and May made incriminating statements; and that she had obtained both marijuana and methamphetamine from

Berry on many occasions.[12]

Ultimately, as previously explained, the reliability of Jones, Shropshire, and Leffew simply did not hinge upon any of them having any particular, established reputation for honesty. Rather, it depended upon some of their statements being against penal interest, such informants allegedly having a relationship with Hindman and/or his alleged accomplices that afforded access allowing the informants to relate in relatively high detail conversations and interactions suggesting that those suspects had committed the bank robberies in question, and that many details of the informant's statements were subject to corroboration, in one way or another. *See Burston*, 159 F.3d at 1334. In that light, any purported mischaracterization of the charges against Jones as arising out of a "domestic violence offense"[13] or failure to detail Shropshire's "unlawful drug business" or Leffew's other alleged illicit dealings had no impact on whether the statements of those informants might be deemed sufficiently reliable to contribute towards probable cause. *See id.*; *Novaton*, 271 F.3d at 988; *United States v. Ofshe*, 817 F.2d 1508, 1513 (11th Cir. 1987); *see also United States v. Haimowitz*, 706 F.2d 1549, 1555-56 (11th Cir. 1983). On top of that, Hindman cannot show that, as found by the magistrate judge and adopted by the court, any conceivable doubts as to the existence of probable cause, including as it might relate to the

---

[12]Based on the nature of her admitted relationships with Berry and May, Leffew does not appear to qualify as a named bystander witness whose reliability might be presumed. *See United States v. Viera*, 644 F.2d 509, 510 n.2 (5th Cir. Unit B 1981); *Martin*, 615 F.2d at 325 n.9; *United States v. Bell*, 457 F.2d 1231, 1238 (5th Cir. 1972).

[13]Documents submitted by Hindman indicate that Jones was arrested in May 2003 on Tennessee state charges of "aggravated assault" and "false imprisonment" or "especially aggravated kidnapping." (Doc. 1-11 at 22; *id.* at 25-27). However, to the extent that the victim of such alleged crimes was Jones's spouse, girlfriend, or other member of his family or household, a matter Hindman does not dispute, it is fair to say that Healy's description that Jones had been arrested on a "domestic violence offense" would have been accurate, at least in the colloquial sense in which Healy appears to have used it. *See generally* Blacks Law Dictionary1564 (7th ed. 1999) (defining "domestic violence" as "[v]iolence between members of a household, usu. spouses; an assault or other violent act committed by one member of a household against another").

35

reliability of these informants, were so substantial and facially apparent that Healy's reliance upon the warrant was not in good faith.  *See Leon*, 468 U.S. at 922.  And finally, to the extent that Hindman seeks to excuse his procedural default of these claims based on the purported ineffectiveness of his counsel, he cannot do so because none of these claims have merit in that they did not affect probable cause.

> **e.**      **Misleading Omissions About Cigarette Butt Evidence to Collect DNA Sample (1st Ground, Subclaim 8)**

In Subclaim 8 of his 1st Ground, Hindman argues that Healy made misleading statements or omissions in his affidavit as it related to establishing probable cause to collect the DNA sample.  (Civ. Doc. 1-2 at 12-17).  In particular, Healy sought authorization to collect Hindman's DNA for the avowed purpose of attempting to match it to a DNA profile obtained from a discarded cigarette butt recovered from an automobile used in the armed robbery of Citizen's Tri-County Bank, in Palmer, Tennessee, on April 3, 2003.  (*See id.*; Healy Aff. at 2-5).  Hindman insists, however, that Healy "had to know" that Hindman "has no known vises (sic) such as smoking cigarettes [or using] drugs or alcohol."  (Civ. Doc. 1-2 at 13).  To support that assertion, Hindman relies on Healy's testimony at the suppression hearing that he had "extensively reviewed" some 25 to 30 FBI files from the 1970's, 80s, and 90s regarding bank robberies in which Hindman was thought to be a potential suspect.  (*See id.*; Crim. Doc. 88 at 94).  Hindman, in turn, claims that, during his federal bank robbery trial in 1981, he "reviewed these same old F.B.I. files [that] Agent Healy speaks of," and that such files "clearly state[ ]," Hindman says, that he has "'no' known vises (sic) such as 'cigarettes,' drugs or alcohol."  (Civ. Doc. 1-2 at 15).

Compelling an accused to give a DNA sample is a search within the meaning of the Fourth Amendment.  *Maryland v. King*, 569 U.S. ___, 133 S. Ct. 1958, 1969 (2013).  To

authorize collection of DNA from a free citizen suspected of crime, the one seeking the search must demonstrate probable cause to believe that such collection will yield evidence of criminal wrongdoing.  *See United States v. Davis*, 690 F.3d 226, 250 (4th Cir. 2012); *see also, e.g., Green v. Nelson*, 595 F.3d 1245, 1252 (11th Cir. 2010); *cf. Hayes v. Florida*, 470 U.S. 811 (1985) (investigative detention of suspect at police station for purposes of obtaining fingerprints violated Fourth Amendment where such detention was without consent, a warrant, or probable cause).  In this context, the government must possess a testable DNA sample sufficiently linked to the subject crime, which might then be compared to the suspect's sample to attempt to establish a "match" placing him at the scene.  *See United States v. Myers*, 2014 WL 3384697, at *7-8 (D. Minn. July 10, 2014); *United States v. Marshall*, 2012 WL 2994020, at *2-3 (W.D.N.Y. July 20, 2012); *United States v. Pakala*, 329 F. Supp. 2d 178, 181 (D. Mass. 2004).  The testable DNA is necessary because DNA, like a fingerprint, is a means of identification and not, in and of itself, evidence of any particular crime.  *See King*, 133 S. Ct. at 1972.

Healy's affidavit alleged that the authorities had a testable DNA sample from a cigarette butt linked to the April 2003 robbery of a bank in Palmer, Tennessee.  The thrust of this Subclaim is that Healy's affidavit seeking collection of a comparison DNA sample from Hindman was allegedly misleading because Healy purportedly "had to know" that Hindman was not known to smoke cigarettes, which, Hindman implies, would have demonstrated a lack of probable cause to believe that the discarded cigarette butt belonged to Hindman.[14]  This specific argument was not raised at trial or on direct appeal, and so the claim is defaulted absent a

---

[14] Ultimately, the DNA from the cigarette butt did not match Hindman's sample.  Of course, what evidence was or was not ultimately found in a search is immaterial to whether probable cause existed to conduct the search.  *See Florida v. Harris*, 568 U.S. ___, ___, 133 S. Ct. 1050, 1059 (2013); 1 W. LaFave, *Search and Seizure* § 3.2(d), at 575 (2d ed. 1987 and Supp. 1995) ("It is axiomatic that hindsight may not be employed in determining whether a prior arrest or search was made upon probable cause.").

showing of cause and prejudice.

Hindman cites no new evidence to support the claim, so the court assumes that he takes the position that the default might be excused based upon the alleged ineffectiveness of his counsel to raise and pursue it.  He fails to make out such a claim, however.

Healy made no affirmative representation in the affidavit that Hindman was a known smoker.  So as far as a *Franks* challenge might have gone, just to get an evidentiary hearing Hindman would have had to make a substantial preliminary showing that Healy knew that Hindman did not smoke cigarettes and that Healy intentionally or recklessly omitted that fact from his affidavit.  However, Hindman's assertion that Healy *knew* that Hindman was not a smoker in 2003 is based solely upon what Hindman supposes Healy read about him in FBI files from the 1970's, 80's, and 90's (none of which are in the record) based upon Hindman's own review in 1981 of FBI files he says were related to him.  Such speculation fails to support that Healy intentionally or recklessly omitted a material fact for purposes of a freestanding claim under *Franks*.  Hindman also fails to show, for purposes of excusing his procedural default, that his counsel's performance was constitutionally deficient or that he suffered prejudice.  Hindman does not allege circumstances showing that his trial attorneys were or should have been aware of underlying facts and evidence necessary to support this particular *Franks* argument, nor can Hindman show that his appellate counsel was constitutionally required to argue the point on appeal given that it was not presented at trial.

Finally, even assuming purely for the sake of argument that Healy's affidavit was insufficient to justify collection of Hindman's DNA in April 2005 based upon the cigarette butt from the April 2003 robbery in Palmer, Tennessee, police would have eventually obtained a DNA exemplar from Hindman.  An independent police investigation subsequently linked

38

Hindman to one of the automobiles used in the August 2005 bank robbery in Elkmont, Alabama, one of the crimes for which Hindman was prosecuted in this case.  That investigation led to Deputy Randy King identifying Hindman as one of the robbers.  The record further shows that police recovered DNA from a mask and other evidence associated with that robbery.  As such, if police did not already have Hindman's DNA exemplar for comparison from the April 2005 warrant, they assuredly could and would have obtained a warrant or otherwise arrested and legally collected DNA from Hindman based solely on the evidence from the investigation of the Elkmont robbery.  *See Nix v. Williams*, 467 U.S. 431, 434 (1984) (recognizing that under the "inevitable discovery" exception to the exclusionary rule, if the prosecution can establish by a preponderance of the evidence that information would have been ultimately recovered by lawful means, the evidence will be admissible); *Carson v. McNeil*, 2010 WL 107899, at *9-10 (N.D. Fla. Jan. 7, 2010); *United States v. Eastman*, 256 F. Supp. 2d 1012, 1021-22 (D.S.D. 2003).  This claim is due to be denied.

> **f.     Misleading Statements Suggesting that Amanda Leffew Identified Hindman as a Participant in a Bank Robbery (1st Ground, Subclaim 13)**

In his final remaining Subclaim in his 1st Ground for relief, Hindman argues that the search warrant used to obtain his DNA was invalid under *Franks* on the theory that Healy made false or misleading statements or omission in his affidavit as it relates to statements by Amanda Leffew that potentially implicated Hindman in one or more bank robberies occurring in early-to-mid-2003.  (Civ. Doc. 1-3 at 19-24).  In his affidavit, Healy recounted a statement made by Leffew on September 2, 2003, in which she advised that while she was at the home of Mickey Berry, he and his associate Billy May admitted to robbing a bank approximately three months earlier and that they were members of a five-man partnership that had been robbing banks and

Bi-Lo stores every three months.  (Healy Aff. at 14).  Leffew further stated that, in the preceding

month, she had seen May with a "large wad" of $100 bills and that she had seen him with an

SKS rifle similar to those used in the robberies that were the subject of the affidavit.  (*Id.*).

Leffew stated that one of the other three bank robbers in the group was a "white male who drives

a Thunderbird and lives on Norcross Road in a duplex."  (*Id.*).  Healy stated that he was aware

that Hindman was a white male who lived in a duplex at 4610 Norcross Road, Hixson,

Tennessee.  (*See id.* at 1-2, 14).

      Hindman now argues that Healy's affidavit is misleading because it omits a number of

purported facts that undercut probable cause to believe that Hindman was the "third man"

involved in the robberies.  First, Hindman complains that, while he did live on Norcross Road in

Hixson, Tennessee, Healy failed to acknowledge that there "are probably as many as 100

duplex's (sic)" on that road.  (Civ. Doc. 1-3 at 22).  Hindman also claims that he has never been

in the presence of Amanda Leffew and that "no doubt Agent Healy knew this."  (*Id.*).  Finally,

Hindman insists that he "never owned or drove any Ford Thunder-Bird (sic) at any time during -

or- even remotely to years (sic), to [the] time in question."  (*Id.*).  Hindman avers that Healy also

"clearly knew this" as well.  (See id. at 22-23).

      These claims are misguided.   Leffew's statements at best played a minor role in

establishing probable cause for the search warrant.  She nowhere identifies Hindman by name

nor claims to have met him.  Even insofar as Leffew's statements imply that Hindman could be

the "third person" in the robbery gang with Berry and May, they do so only obliquely, and no one

would suggest that, standing alone, they established probable cause for a search warrant.  Rather,

Leffew's statements merely tended to corroborate that Hindman participated in the bank

robberies that were the subject of the warrant application; her statement contained many

consistencies with those made by Shropshire and others in Healy's affidavit that more clearly indicated that Hindman was robbing banks in 2003 with Berry and May.[15]

Further, the corroborative value of Leffew's statements would not be materially affected by any of the ostensible affidavit defects now decried by Hindman. Even if "probably as many as 100" duplexes were on Norcross Road, the omission of such minutia is insignificant, not reckless or worse, particularly given the other witness statements supporting that Hindman had been robbing banks in that time frame with Berry and May. *See Madiwale v. Savaiko*, 117 F.3d 1321, 1327 (11th Cir. 1997); *Ofshe*, 817 F.2d at 1513.

Next, regarding Hindman's claim that Healy knew that he had never met Leffew or been in her presence, Hindman offers nothing but a bald conclusory assertion to that effect. Hindman likewise fails to support his insistence that Healy "clearly knew" that Hindman did not own or drive a Ford Thunderbird and knowingly or recklessly omitted that fact from his affidavit. The court would note Healy did not make an affirmative allegation in his affidavit that Hindman was known to drive a Thunderbird. On top of that, even Hindman's own allegations on the subject are not free from ambiguity. That is, he does not claim that he "never" owned or drove a Thunderbird; he only makes a vague denial that he did not do so "during" or "remotely to" the "time in question." Hindman does point out that Healy conceded at the suppression hearing that,

---

[15] *See, e.g.*, Healy Aff. at 7, 11 (Jones and Shropshire both alleged that Hindman had large amounts of unexplained cash in May 2003); at 9 (confidential informant claimed to have seen, in April 2003, the day after a bank robbery in Grundy County, Tennessee, a large amount of cash on the bed at Berry's house and to have overheard Berry and others talking about how they had "switched vehicles and passed the law while on the way"); at 10 (Shropshire advised in December 2003 that, the preceding summer, Hindman had told Shropshire that he was robbing banks with Berry and May and had repaid Shropshire a $1,000 loan in small bills that Hindman had indicated had come from a bank robbery in Sequatchie or Grundy County); at 11-12 (Shropshire stated that May had also said he was robbing banks with Hindman); at 12-13 (Jason Mincey stated in December 2003 that his father and May had made statements and showed him evidence indicating that they had robbed a bank in Turtletown, Tennessee, with Hindman).

despite having performed "some" surveillance of Hindman, he had never "seen him" in a

Thunderbird.  (Crim. Doc. 88 at 105).  That fact does not, however, establish that Healy

affirmatively knew that Hindman did not drive a Thunderbird during the time period referenced

by Leffew or that, in the context of the affidavit as a whole, any omission by Healy was

intentional or reckless or impacted the existence of probable cause.  This claim lacks merit.

### 2.    Collection of DNA at Chattanooga FBI Offices (2d Ground)

Hindman's "2nd Ground" for postconviction relief is based on Hindman's theory that,

while the search warrant obtained by Healy did authorize the collection of his DNA, it only

permitted such collection to take place at Hindman's residence on Norcross Road in Hixson,

Tennessee.  And because agents transported him from that residence to the FBI offices in

Chattanooga, Tennessee, and collected his DNA sample there, Hindman posits that the DNA

evidence was rendered inadmissible.  (Civ. Doc. 1-4 at 5-9).

Even if this claim had merit, it is procedurally defaulted and Hindman fails to show cause

or prejudice.  Indeed, the underlying premise of Hindman's argument that the warrant required

any collection of Hindman's DNA to be done only at his residence is simply false.  Rather, the

warrant authorized both (1) a search of the property at Hindman's duplex on Norcross Road and

(2) a search for DNA evidence and fingerprints "on the person of" Hindman.  (Civ. Doc. 1-10 at

8).  In other words, the warrant did not on its face limit collection of Hindman's DNA only to the

residence.  "If there is probable cause to believe that a certain specifically-described person has

the described things to be seized on his person, there is no reason why the search of that person

must be limited to a particular location."  2 W. LaFave, *Search and Seizure* § 4.5(e), at 596-97

(4th ed. 2004).

Hindman also fails to explain why, because the agents legally could have collected his

DNA at the residence, it makes any practical difference that he was taken to the FBI offices; collecting a DNA sample at the office might be reasonably justified to head off a defendant's claims that collection of such forensic evidence in the field somehow rendered it subject to potential contamination.   Further, any conceivable Fourth Amendment violation in this setting would have been purely technical and not clearly established by prior law, thereby authorizing admission under *Leon*'s "good faith" exception to the exclusionary rule.

Because Hindman cannot show that he was entitled to have the DNA evidence suppressed on this basis, he also cannot show that his counsel was ineffective for failing to raise such an argument.  This claim is due to be denied.

### 3.        Claims Related to the Suppression Hearing (3d Ground)

In his 3rd Ground for relief, Hindman makes several arguments related to the suppression hearing conducted by the magistrate judge in October 2006.  Specifically,  Hindman asserts six Subclaims for relief:

1.      Healy knowingly and intentionally testified falsely that Mickey Berry had been arrested and convicted of bank robbery (Civ. Doc. 1-4 at 12);

2.      Healy falsely testified that Jackie Jones was convicted of bank robbery along with Hindman (*id*. at 14);

3.      Healy falsely testified that Jones was being held on domestic violence charges at the time of the interview with Healy (*id*. at 20);

4.      Healy falsely testified that Jones stated that Hindman was involved in the Big Apple grocery store robbery in Atlanta that involved a shoot-out (*id*. at 27);

5.      The magistrate judge incorrectly ruled when recommending that the motion to suppress be denied (*id*. at 32); and

6.      Defense counsel David Luker was ineffective at the suppression hearing in failing to call Shropshire and Jones as witnesses because they would have been caught "red-handed in all [their] lies" (*id.* at 36-37).

The United States responds that these claims are procedurally barred from review because they could have been raised on direct appeal, but were not.  (Civ. Doc. 13 at 18).  The United States also argues that Hindman has not demonstrated cause and prejudice to overcome the procedural default.  (*Id*.).  The court agrees.

As to Subclaims 1 through 4, Hindman argues to overcome any procedural default that much of the information demonstrating the falsity of Healy's statements—criminal history reports and court records—were discovered subsequent to the original proceedings.  However, these documents existed at the time of trial and could have been obtained if deemed relevant in the exercise of due diligence.  But even if Hindman were correct, Hindman has not shown the requisite prejudice to warrant relief, as demonstrated below.  Subclaim 5—based upon a purportedly erroneous ruling by the magistrate judge–could have been raised before the district judge and on direct appeal but was not.  To the extent that Hindman argues that his appellate counsel was ineffective, the discussion below demonstrates that he has not demonstrated any prejudice.  As to Subclaim 6—alleging ineffective assistance for failing to call Shropshire and Jones at the suppression hearing—Hindman has demonstrated no prejudice entitling him to relief.  Even if they were called and effectively impeached as to some matters, that would not demonstrate that the affiant, Healy, knowingly or recklessly provided false information in the affidavit that was necessary to the probable cause determination.

First, Hindman complains in Subclaim 1 of his 3rd Ground that Healy falsely testified at the suppression hearing that Berry had been arrested and convicted of bank robbery.  (Civ. Doc. 1-4 at 12 of 56).  Hindman is correct that Healy did testify at the suppression hearing that Berry and others had been arrested and convicted of bank robbery.  (Crim. Doc. 88 at 95).  Further, Berry's Tennessee criminal history records provided by Hindman do not show that he was

convicted of bank robbery.  (Civ. Doc. 1-13 at 16-22).  Hindman does not include Berry's federal criminal records, however, which might also show a bank robbery conviction.

However, even assuming that Healy's hearing testimony on the point was mistaken or even intentionally false, Hindman was not prejudiced because Healy made no similar representation in the search warrant affidavit.  Rather, he stated only that Shropshire told him that Hindman was robbing banks with May and Berry and that he (Shropshire) had robbed banks with Hindman, Berry, and others in the 1970's and 1980's.  (Healy Aff. at 10).  Hindman offers no evidence that Healy knew that Berry had not been convicted of bank robbery; regardless, whether Berry had such a prior conviction was not at all necessary to the probable cause determination used to justify issuance of the search warrant.

Hindman similarly complains in Subclaim 2 that Healy falsely testified that Jackie Jones was convicted of bank robbery.  (Civ. Doc. 1-4 at 14).  A review of the transcript shows that Healy did testify that "[James] Jones was convicted of armed robberies with these individuals. He was on probation for those robberies at the time of the interview."  (Crim. Doc. 88 at 85). Again, however, Hindman is not entitled to any relief because this information was not in the challenged affidavit and Hindman suffered no prejudice as a result of the testimony.

Hindman's complaint in Subclaim 3 is that Healy falsely testified that Jones was being held following his arrest for a "domestic violence offense" at the time of his interview.  (Civ. Doc. 1-4 at 20).  Healy did make a similar statement in his search warrant affidavit.  (Healy Aff. at 7).  However, for the same reasons that Hindman's claim fails as it relates to that representation in Healy's affidavit, it also fails as it relates to Healy's testimony at the suppression hearing.  In addition, Hindman fails to explain how the statement at the suppression hearing resulted in prejudice.  This claim is due to be denied.

Hindman asserts in Subclaim 4 of this ground that Healy falsely testified that Shropshire stated that Hindman was involved in the Big Apple grocery store robbery in Atlanta.  (Civ. Doc. 1-4 at 27).  Again, this contention is similar to Hindman's earlier challenge to Healy's statement in the affidavit concerning this information being included in the probable cause statement.  As determined previously, however, Hindman is entitled to no relief.  To the extent Jones's information was repeated by Healy at the hearing, Hindman has not demonstrated prejudice.  In any event, Healy testified that he was not able to corroborate Jones's statement that Hindman was involved in the robbery.  (Crim. Doc. 88 at 95-96).

Hindman asserts in Subclaim 5 that Magistrate Judge Ott incorrectly determined that the DNA evidence should not be suppressed.  (Civ. Doc. 1-4 at 32).  He is entitled to no relief for a number of reasons.  First, the claim is procedurally barred from review.  Second, it is without merit.  As to the procedural default, the issue could have been, and should have been, raised on appeal.  Hindman attempts to excuse the default by alleging that his counsel were ineffective in not objecting to the magistrate judge's determination and not appealing to the Eleventh Circuit Court of Appeals.  This attempt is insufficient because he can show no prejudice.

A review of this claim for purposes of showing prejudice must begin with the realization that a judicial determination of probable cause is not to be disturbed absent a showing that it was arbitrary.  *United States v. Long*, 674 F.2d 848, 852 (11th Cir. 1982).  A reading of the four corners of Healy's affidavit demonstrates the requisite probable cause.  The issuing federal magistrate judge in the Tennessee District Court reasonably found probable cause, and nothing from the suppression hearing before Judge Ott negates the initial finding of probable cause.  Additionally, Magistrate Judge Ott specifically found that Healy acted in good faith.  The undersigned district judge agreed.  Premised on the record, Hindman has not shown that counsel

46

was ineffective at the trial level or at the appellate level in failing to raise this claim or that he suffered any prejudice.

Lastly, Hindman argues in Subclaim 6 that his trial counsel was ineffective in not calling Shropshire and Jones as defense witnesses at the suppression hearing to impeach the statements attributed to them in the affidavit.  This claim is due to be denied for two reasons.  First, Hindman cannot show that counsel's performance was defective in not calling these two individuals.  He has not shown how calling them would have changed the court's determination of the motion.  Nothing in the record suggests that either Shropshire or Jones would recant their statements.  Second, Henderson has made an inadequate showing of prejudice.  The time conflicts demonstrated by Hindman via his submissions of court records, etc.  do not establish the falsity of the statements by Shropshire and Jones, as discussed above.  Lastly, even if the statements were false, no evidence shows Healy was aware of the falsity or that the alleged falsity would have negated the other evidence establishing probable cause.  This claim is due to be denied.

### 4.    Race Discrimination in Jury Selection Procedure (4th and 5th Grounds)

In his 4th and 5th Grounds, Hindman brings claims alleging that African-Americans were excluded in the jury selection procedure, in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments.  (Civ. Doc. 1-4 at 40-44).  In support, Hindman emphasizes approximately 40 persons were on his venire panel, but not one was African-American, which resulted, of course, in no African-Americans being on his petit jury.  (*Id.* at 42).  Hindman posits that such composition had to be the result of race discrimination because, he says, Birmingham, Alabama, where the trial took place, "is 81% Black," while Huntsville, another city located

within this judicial district,"is 31% Black," with both figures being cited from the 2007 World Almanac.  (*Id.* at 41).

The Sixth Amendment secures to criminal defendants the right to be tried by an impartial jury drawn from sources reflecting a fair cross section of the community.  *Berghuis v. Smith*, 559 U.S. 314, 319 (2010); *Taylor v. Louisiana*, 419 U.S. 522, 527 (1975).  In *Duren v. Missouri*, 439 U.S. 357, 364 (1979), the Supreme Court described three showings a criminal defendant must make to establish a prima facie violation of the Sixth Amendment's fair-cross-section requirement:  "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process."  Failure to establish any one of these elements results in the failure of the Sixth Amendment claim.  *United States v. Pepe*, 747 F.2d 632, 649 (11th Cir. 1984).  To determine whether jury representation is fair and reasonable, courts in this Circuit look to the "absolute disparity produced by the selection process," which, in such cases, means there must be more than a ten percentage point disparity between the percentage of the group in the jury-eligible population and the percent of the group in the district court's qualified jury wheel (QJW) pool.  *See United States v. Carmichael*, 560 F.3d 1270, 1280-81 (11th Cir. 2009); *United States v. Grisham*, 63 F.3d 1074, 1079-80 (11th Cir. 1995); *Pepe*, 747 F.2d at 649; *see also United States v. Dees*, ___ F. App'x ___, ___, 2015 WL 794927, at *2 (11th Cir. Feb. 26, 2015).

"The Equal Protection Clause of the Fourteenth Amendment does not apply directly to the federal government; however, the principles of equal protection are applied to the federal government through the Due Process Clause of the Fifth Amendment."  *Swisher Intern. Inc. v.*

48

*Schafer*, 550 F.3d 1046, 1059 n.13 (11th Cir. 2008) (citing *Bolling v. Sharpe*, 347 U.S. 497, 498-500 (1954)).  To establish a violation of equal protection in the context of federal jury selection a defendant must show "(1) that he or she is a member of a group capable of being singled out for discriminatory treatment, (2) that members of this group were substantially underrepresented on the venire, and (3) that the venire was selected under a practice providing an opportunity for discrimination."  *Grisham*, 63 F.3d at 1081 (quoting *Cunningham v. Zant*, 928 F.2d at 1006, 1013 (11th Cir. 1991)).  Although the prima facie case for an equal protection claim resembles the elements of a fair cross-section claim, the purpose of an equal protection claim is to determine whether the disparity in the jury venire is the result of a discriminatory purpose.  *Id.* (citing *Duren*, 439 U.S. at 368 n. 26).

With respect to these claims, Hindman has done no more than (1) assert that no African-Americans were on his particular venire of approximately 40 persons; and (2) offer statistics indicating that two of the cities within this judicial district each have a substantial African-American population.  That assertion does not even begin to show that at least a 10% absolute disparity between the percentage of African Americans in the jury-eligible population of the community and the percentage of African-Americans within this court's QJW pool for criminal cases at the time of Hindman's trial in 2007, as required to make out a fair cross section claim. *See United States v. Crawford*, 568 F. App'x 725, 727 (11th Cir. 2014); *Carmichael*, 560 F.3d at 1280; *Dees*, 2015 WL 794927, at *2; *United States v. Downs*, 217 F. App'x 841, 845 (11th Cir. 2006).  And that is so regardless of whether the "community" is deemed to encompass the population of either the entire judicial district or just the particular divisions within the district

from which the venire in Hindman's case was drawn.[16]  *See Grisham*, 63 F.3d at 1079-80; *United States v. Rodriguez*, 776 F.2d 1509, 1511 (11th Cir. 1985); (*see also generally* Civ. Doc. 13-4 (identifying the members of the venire and the municipalities in which they resided)).   Hindman has also failed to show that any under-representation of African-Americans that might potentially exist was due to systematic exclusion, never mind purposeful race discrimination.  *See United States v. Clarke*, 562 F.3d 1158, 1163 (11th Cir. 2009); *Downs*, 217 F. App'x at 845.

Finally, because these claims were not raised at trial or on direct appeal, they are procedurally defaulted absent a showing of cause and prejudice.  Hindman fails to proffer any new evidence on these claims that was not available at the time of trial in the exercise of due diligence.  Likewise, because these claims lack merit, Hindman's counsel was not ineffective in failing to raise them.  *See Sneed v. Fla. DOC*, 496 F. App'x 20, 27 (11th Cir. 2012); *see also Jackson v. Herring*, 42 F.3d 1350, 1362 (11th Cir.1995) (finding that the habeas petitioner could not demonstrate that he was prejudiced by his trial counsel's failure to raise an objection under *Swain v. Alabama*, 380 U.S. 202 (1965), because "[n]othing in the record indicates that a racially balanced jury would have been more likely to acquit or convict of a lesser charge than was the all-white jury in this case").  These claims are due to be rejected.

### 5.    Identification Procedure Claims (6th, 7th, 8th, and 36th Grounds)

Hindman raises several challenges to the in-court identification of him by witnesses and the out-of-court procedures that led to those identifications.  For the reasons stated below, these claims are due to be denied.

---

[16] The jury in Hindman's case filed in the Northeastern Division of this District was drawn from that Division comprised of six counties.  Huntsville is but one city in that Division.  Birmingham is not in the Northeastern Division.

At trial, Limestone County Sheriff's Deputy Randy King testified that, on August 12, 2005, he responded to a radio dispatch advising that the Community Bank in Elkmont had been robbed. (R. 244-45). Deputy King stated that a report advised that a gold colored automobile had been used in the robbery and that it was seen turning onto Morris Road in Elkmont. King then proceeded from his location onto that road and came to be following at a distance behind another responding vehicle being driven by Donnie Johns, Chief of the Elkmont Police Department. King stated that, after he had driven about a mile down Morris Road, a small green automobile pulled right out in front of him from an unnamed, unpaved road coming out of a field, forcing King to brake and swerve to avoid hitting the car. King further testified that, as he slowed and passed by the green car, he was able to see the driver and give his physical description over the radio as a white male with gray or salt-and-pepper hair, wearing a striped shirt. (R. 249, 275-76). When the prosecutor asked whether King could see the driver of the green car in the courtroom, King identified Hindman. (*Id.* at 249).

Deputy King further related that, after the green car pulled out onto Morris Road, he and Chief Johns attempted to pursue it, and they eventually came upon the vehicle stopped on the side of an adjoining road, with no one inside it. Other witnesses testified to finding in or near the green car masks, gloves, several $100 bills, and other evidence linked to the robbery. As other units began to arrive on the scene, King returned to the field road where he had first seen the green car pull out. Proceeding in that area, he found a gold Chrysler automobile that matched the description of the vehicle used in the robbery, parked in a hedgerow with its ignition switch broken open and the engine still running.

Subsequently, King also described to the jury how investigators later traced the green getaway car, a Toyota Camry, to a woman in the Chattanooga area, and police were advised as a

51

result that, shortly before the Elkmont robbery, she had left the vehicle for repairs with a man named Jimmy Hindman.  This information prompted King, he said, to contact the Giles County, Tennessee, Sheriff's Department and request a driver's license photograph for a person in the Chattanooga area with the name Jimmy Hindman.  King said he later received a responsive email that attached a copy of Hindman's driver's licence photo, which King recognized as depicting the driver of the green car.  (R. 259, 261-62; *see also* R. 285-90 in which King's version of these events was corroborated by the testimony of his superior, Captain Stanley McNatt).  King again then pointed out Hindman in court.  (R. 262).

For his part, Chief Johns had also testified at trial that someone from the Limestone County Sheriff's Department had shown him a single photograph of a person and asked if Chief Johns could identify him as having been in the green car.  (R. 236, 238).  Chief Johns stated, however, that he was unable to make such an identification from the photo. (R. 236, 240).

In his 6th, 7th, 8th, and 36th Grounds, Hindman raises a host of claims related to the identifications by Deputy King and to Chief Johns' testimony about being shown a photograph for an attempted identification.  First, as to Deputy King's identifications, Hindman maintains in his 6th Ground (Civ. Doc. 1-4 at 45-55) that they should have been excluded because they were tainted by Deputy King's initial, out-of-court identification based upon his viewing of Hindman's driver's license photograph by itself.  Hindman argues that the circumstances of that prior identification were unduly suggestive because his photo was not presented in an array of others showing similar-looking individuals.

In this vein, Hindman also takes issue with Deputy King's testimony addressing the particular circumstances under which Deputy King says he first came to view Hindman's photo.  That is, King claims that he asked for and received an emailed copy of a driver's license photo

for Hindman from Tennessee authorities after Hindman's name came up in the investigation.

King also testified to the same effect at a suppression hearing in October 2006.  (*See* Crim. Doc.

88 at 18-22, 31-32).  Hindman now insists in his 8th Ground (Civ. Doc. 1-5 at 3-6) that King's

testimony on that point is perjured and contradicted by other evidence that, according to

Hindman, shows that King was actually first shown the single, suggestive photo of Hindman *by

the FBI*.

In support, Hindman first relies upon testimony by FBI Special Agent Jeff Dowdy given

at a detention hearing in April 2006 before Magistrate Judge Harwell G. Davis.  Specifically,

Hindman points out that, in setting forth the circumstances of the Elkmont robbery and its

associated investigation, Agent Dowdy recounted on direct examination that Deputy King had

been able to identify Hindman as the driver of the green Camry:

> Q.    Did the deputy get a look at either the driver or the passenger in the
>       vehicle?
>
> A.    Yes, sir.  He saw the driver.
>
> Q.    Okay.  And was he able to identify him?
>
> A.    Yes, he identified him.
>
> Q.    Who did he identify him as?
>
> A.    He identified him as Jimmy Doyle Hindman.
>
>       THE COURT:          Say that again.  Who identified him?
>
>       THE DEFENDANT:   The Limestone County deputy saw the driver of the
>                        Toyota Camry, and he identified -- has since
>                        identified him as the defendant. I'm just trying to --
>
> Q.    He was shown a picture of --
>
> A.    Yes, he was.

Q.      -- of Mr. Hindman?

A.      Of Mr. Hindman.

THE COURT:          A picture or series of pictures?

THE WITNESS:        It was a driver's license photograph.

THE COURT:          Okay.

(Crim. Doc. 154 at 11-12).  And on cross-examination, Dowdy further testified:

Q.      And the photo you say the deputy used was a driver's license photograph?

A.      Yes, sir.  As I recall, it was a Tennessee driver's license.

Q.      Okay.  Was it presented as a single photo?

A.      Yes.  As I understand, it was a single photo.

Q.      And do you know when that was presented to that deputy in relationship to the date of the robbery?

A.      No, sir.  I don't know when it was given to him.  *I didn't give it to him myself.*

(*Id.* at 19) (emphasis added).

But Hindman also goes further, claiming that, at that same hearing, Deputy King himself also expressly admitted "several times" in response to questioning by Magistrate Judge Davis "that the F.B.I. showed him (King) the single . . . photo of Def[endant] Hindman."  (Civ. Doc. 1-4 at 49).  The reporter's certified transcript, however, does not contain any further testimony by King related to King's identification of Hindman from the photograph.  Nonetheless, Hindman insists that King did give such testimony and that the government has "deleted" or otherwise "removed" it from the transcript.  (*Id.* at 49-50).

In support, Hindman's offers his own assertion, made under penalty of perjury, as well as five materially identical, hand-written affidavits from his son, his girlfriend, and other

54

individuals, who all claim to have witnessed King tell Magistrate Judge Davis at the hearing about having been shown a single photo of Hindman by the FBI.  (*See* Doc. 1-4 at 48-49, Doc. 1-16 at 40-44).  Hindman claims that the removal or omission of King's testimony from the transcript violated his constitutional rights and forms the basis of his 7th Ground for relief.  (Civ. Doc. 1-4 at 56, Doc. 1-5 at 1-2).  He also claims in his 36th Ground that trial counsel was ineffective for failing to argue Hindman's theory about the transcript alteration or omission. (Civ. Doc. 1-9 at 12).

All of these claims but the one alleging ineffective assistance of counsel, however, are procedurally defaulted.  Hindman's counsel also filed a pretrial motion to suppress King's identification of Hindman on the ground that the circumstances of King's initial identification, based on his viewing Hindman's driver's license photo in isolation, was unduly suggestive. (Crim. Doc. 41).  After a hearing, however, Magistrate Judge Ott issued a report recommending that the motion be denied; he concluded that, under *United States v. Diaz*, 248 F.3d 1065 (11th Cir. 2001), even if viewing the single photograph was overly suggestive, under the totality of the circumstances, other relevant considerations rendered King's identification sufficiently reliable to be admissible.  (Crim. Doc. 56 at 4-6).  Hindman's counsel did not object to the magistrate judge's report and recommendation, which was later adopted by this court.  (Crim. Docs. 60, 61).

At trial, Hindman's counsel again objected to King's identification of Hindman based on the suggestive nature of the single photo, but the court overruled those objections.  (R. 249, 259-61).

At no time, however, did Hindman's counsel raise a timely objection or argument based on a theory that King's testimony about how he came to view Hindman's photo was false; that King had been shown the single photo by the FBI; or anything about the alleged incompleteness

or alteration of a transcript.  Nor did Hindman raise any claim regarding King's identification on direct appeal. Asf

Because his substantive claims are defaulted, Hindman must show both cause for the default and resulting prejudice.  As to cause, Hindman has not offered any new evidence on these claims that was not reasonably available at the time of trial in the exercise of due diligence.  He also casts his counsel as ineffective for failing to timely present, preserve, and argue all of his identification-procedure claims at trial through direct appeal.  However, to the extent that Hindman argues that his counsel should have continued to press the claim from his motion to suppress that King's identification was due to be excluded based on the single photo view itself, Hindman cannot show deficient performance or prejudice because the claim was without merit, for the reasons stated in the magistrate judge's report and recommendation adopted by the court. (*See* Crim. Docs. 56, 60, 61); *see also Manson v. Brathwaite*, 432 U.S. 98, 114-17 (1977) (holding that, although one-photo identification procedure was suggestive, the totality of the circumstances did not show a substantial likelihood of irreparable misidentification where a trained police officer made the identification who had a sufficient opportunity to view the suspect, accurately described him, positively identified his photograph, and made the photograph identification only two days after the crime);  *Meeks v. Moore*, 216 F.3d 951, 968 (11th Cir. 2000) (counsel was not ineffective for failing to argue non-meritorious claims related to identification procedure).

Hindman likewise cannot show that his counsel was ineffective for failing to raise suppression arguments based on Hindman's theory that it was *the FBI* that supposedly orchestrated Deputy King's viewing of Hindman's photo by itself.  In the first place, it is unclear why Hindman supposes that the admissibility of Deputy King's identification hinged upon

whether he was shown the photo by someone in the FBI as opposed to, as Deputy King testified at the suppression hearing and at trial, Deputy King's office having requested and received an email with the photo from Tennessee state authorities in following up a lead in the investigation. Indeed, the court concludes that, considering the totality of the circumstances, whether the FBI showed King Hindman's photo or whether Tennessee authorities sent it to him by email as King claims ultimately would not alter the reliability or admissibility of King's identification. Thus, Hindman cannot show prejudice.

Even assuming for the sake of argument that Hindman's proposed FBI angle could have been material, he has failed to show that his counsel had a sufficient evidentiary basis to convincingly argue that King's testimony at the suppression hearing and at trial regarding how he came to view Hindman's photo was materially false. Contrary to Hindman's assertion, Agent Dowdy's detention hearing testimony set forth above, in which he told the court in generally outlining the evidence against Hindman that King had identified Hindman after being "shown" a single driver's license photo, does not purport to identify who did that "showing" or other circumstances regarding how it happened. Indeed, Agent Dowdy expressly disavowed that he had shown the photo to King, and his testimony clearly indicates that he did not himself know just how the photo had been "shown" to King or when that occurred.

The decision of Hindman's counsel to forego arguments based on Hindman's assertion that King himself allegedly acknowledged at the detention hearing that he had been shown Hindman's single photo by the FBI but that such testimony was omitted or deleted from the detention hearing transcript was also reasonable. As stated above, the admissibility of Deputy King's identification did not depend on whether he was shown the photo by the FBI as opposed having viewed it in an email from Tennessee law enforcement. Further, the certified transcript

(Crim. Doc. 154 at 27) is deemed prima facie a correct statement of the testimony and proceedings at the detention hearing. *See* 28 U.S.C. § 753(b). Hindman's allegation that the transcript has been altered or is incomplete is supported by nothing but his own recollection and affidavits that were clearly drafted by Hindman himself and then signed by family members and others who are obviously sympathetic to him. Moreover, the transcript appears strongly to suggest that Hindman and his supporters are conflating the testimony of FBI Agent Dowdy, who was asked questions by both the court and counsel about Deputy King's photo identification, with that of Deputy King himself, who was not. *See also generally Hindman v. Healy*, 278 F. App'x 893, 896 (11th Cir. 2008) (affirming the dismissal of Hindman's damages claim against the court reporter for the detention hearing based upon her delivery of an allegedly false transcript). These claims are due to be denied.

Finally, Hindman's 6th Ground also contains claims related to an attempted photo identification by Chief Johns. At trial, Chief Johns testified that the Limestone Sheriff's Department showed him a single photograph and asked him to identify the individual in the photo, presumably Hindman. Chiefs John, however, stated that he had been unable to do so. In his petition, Hindman contends that the government concealed that Chief Johns had been shown the photo and claims that Chief Johns told Richard Cook, a private investigator working for Hindman, that no one had approached him with pictures to have him make an identification. (Civ. Doc. 1-17 at 4-5). Hindman also seems to claim that it was a physical impossibility for Chief Johns to have identified him because the testimony shows that he was on the wrong side of the road at the time of the purported sighting and because Chief Johns allegedly later told Cook, a "dramatically" different "story" compared to his trial testimony. (Civ. Doc. 1-4 at 46).

These claims are defaulted because they could have been but were not raised at trial or on

direct appeal.  But more fundamentally, they are much ado about nothing: regardless of what photo Johns was shown or when or which side of the road he might have been driving on at any particular time, *Chief Johns never identified Hindman*.  Rather, Chief Johns told the jury that, although he pursued the green car at a distance and that he was later shown a single photo of a suspect, he was *unable to identify the person*.  This matter is thus immaterial.  Further, about eight weeks passed between the time that Chief Johns allegedly gave his unsworn statement to Cook and when Chief Johns testified at trial, so it was entirely possible that Chief Johns might have been shown the suspect photo in the interim.[17]  These claims are without merit and are due to be denied.

### 6.    Threat to Hindman's Private Investigator (9th Ground)

In his 9th Ground (Civ. Doc. 1-5 at 7-9), Hindman alleges that, long after his conviction had been affirmed on direct appeal, his private investigator, Richard Cook, traveled to Alabama in October 2008 and again spoke with Chief Johns and others about the case.  Hindman further claims that, upon returning to Tennessee that evening, Cook received an anonymous, "very mean an[d] threatening" phone call in which he was advised that, "for his health," he "better never come back to Limestone Co[unty,] Alabama."  (*Id.* at 9; *see also* Civ. Doc. 1-17 at 26-40).

However, even assuming for the sake of argument that Hindman's allegations impute the purported threat to some government agent, this claim is not cognizable in this proceeding because the claim does not attack the conviction or sentence imposed.  *See generally* 28 U.S.C. § 2255(a) ("A prisoner ... may move the court which imposed the sentence to vacate, set aside or correct the sentence").  Rather, the alleged threat made to Hindman's investigator is a collateral

---

[17]The court would note that Johns' testimony also fails to lend any tangential support to Hindman's theory that it was the FBI who was creating single-photo viewings insofar as Johns stated that he was shown a photo by someone from the Limestone County Sheriff's Department.

matter that occurred outside of court, after Hindman's conviction had been affirmed by the Eleventh Circuit.  As such, these events could not have possibly had any influence on the proceedings at trial or on direct appeal and have no potential to impugn the validity of Hindman's federal sentence.  *Cf. Carroll v. Secretary, DOC*, 574 F.3d 1354, 1365 (11th Cir. 2009) (constitutional defects in state postconviction proceedings do not provide a basis for habeas relief because such defects do not undermine the legality of the underlying conviction). This claim is due to be denied.

### 7.   Claims Related to Evidence Collection by Deputy Justin Camp (10th and 11th Grounds)

In his 10th and 11th Grounds, Hindman raises claims related to the admission of evidence collected by Deputy Justin Camp of the Limestone County Sheriff's Department.  Deputy Camp died in December 2006, so he did not testify at the trial in February 2007.  However, another member of the department, Deputy Jim Landis, testified that he witnessed Camp collect, photograph, bag, and seal a number of items found at the scene where police discovered the abandoned green Camry following the Elkmont robbery on Friday, August 12, 2005.  (*See* R. 291-313).  Such items included a duffel bag, two masks, hats, gloves, ammunition, and weapons magazines.  Deputy Landis further stated that he saw Deputy Camp place the evidence in the trunk of his patrol vehicle and drive away from the scene to take the evidence back to the sheriff's department at the county jail.  Then, Captain Stanley McNatt of the Limestone County Sheriff's Department testified that he witnessed Deputy Camp bring the evidence in, lock it in Deputy Camp's personal office over the weekend, and tender it the following Monday to FBI Agent Jeff Dowdy.  (R. 317-19).  In turn, Agent Dowdy confirmed his receipt of the evidence from Deputy Camp and that he shipped it to FBI headquarters for forensic testing.  (R. 321-23).

An ensuing DNA analysis tied Hindman to one of the masks.

Hindman contends in his 10th Ground that the admission of testimony of other witnesses regarding Deputy Camp's evidence-collection activities and his role in the chain of custody violated his rights under the Confrontation Clause.[18]  (Civ. Doc. 1-5 at 10-13).  Hindman also seems here to contest the admissibility of the evidence gathered by Camp on the ground that no one testified specifically to what Camp did with the evidence between the time that he drove away from the scene until his arrival at the sheriff's department.  (Civ. Doc. 1-5 at 10-12).  However, these claims are defaulted because they could have been raised at trial and on direct appeal but were not, and Hindman can show neither cause nor prejudice.

Under the Confrontation Clause "the government is not required to produce every witness who laid hands on the evidence."  *United States v. Eady*, 591 F. App'x 711, 718 (11th Cir. 2014) (internal quotation marks omitted); *see also Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 311 n.1 (2009) ("[W]e do not hold, and it is not the case, that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case....").  The Confrontation Clause only prohibits the introduction of "testimonial" statements by a nontestifying witness, unless the witness is "unavailable to testify, and the defendant had ... a prior opportunity for cross-examination."  *Crawford v. Washington*, 541 U.S. 36, 54 (2004).  Thus, that provision has no application to testimony by Deputy Landis, Deputy McNatt, or Agent Dowd about Deputy Camp's conduct that they personally observed.  Further, to the extent that Hindman means to challenge the admissibility of the evidence based upon the chain of custody, that claim also fails.

---

[18]The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that "in all criminal prosecutions, the accused shall enjoy the right…to be confronted with the witnesses against him."

Any gaps that might potentially have existed here would have affected only the weight of the evidence, not its admissibility.  *See Melendez-Diaz*, 557 U.S. at 311 n.1; *United States v. Roberson*, 897 F.2d 1092, 1096 (11th Cir. 1990); *Eady*, 591 F. App'x at 718 n.2.

In his 11th Ground, Hindman contends that the government violated his constitutional rights under *Brady v. Maryland*, 373 U.S. 83 (1963); *United States v. Bagley*, 473 U.S. 667 (1985); and the Jencks Act, 18 U.S.C. § 3500, by allegedly failing to reveal "the existence of Mr. Camp" during discovery and by having "concealed all investigative reports" by Camp.  (Civ. Doc. 1-5 at 14-15).  These claims also were not raised at trial or on direct appeal and are defaulted.  They are meritless in any case.

Nothing in the record supports that Camp authored any "investigative reports," and Hindman's conclusory allegations fail to show that the government withheld any materials to which he might have been entitled under any applicable federal statute, rule of criminal procedure, or the Constitution.  Hindman also fails to show that the government "concealed" the "existence" of Camp or to explain how any prejudice supposedly resulted.  These claims are due to be denied.

## 8.    Failure to Produce or Call Jackie Jones to Testify at Trial (12th, 13th, and 35th Grounds)

Next, Hindman raises several claims related to the fact that Jackie Jones was not called or made to testify at trial in February 2007.  Again, Jones was an informant who made statements in May 2003 that were recounted in an affidavit by FBI Agent Paul Healy in support of a search warrant issued in April 2005 that authorized the collection of a DNA exemplar from Hindman.  (*See* Healy Aff. at 7).  That sample was later used to match DNA on a mask recovered near the green getaway car from the August 2005 bank robbery in Elkmont.  Hindman says he desired to

"'finally' confront" Jones at trial "about all the all the vicious - ruthless lie's (sic) ... that Jones

had told in the affidavit for [the] search against" Hindman.  (Civ. Doc. 1-5 at 16-17).

Hindman claims, however, that he was foiled in those efforts by both his attorney and the

court.  In particular, Hindman emphasizes that his trial counsel, Rick Burgess, told the court that

Jones was not present in court and was not available as a witness because, although he

supposedly was serving a sentence somewhere in the Tennessee state prison system, his location

was unknown.  In response, the court advised Hindman:  "We haven't been able to find Jackie

Jones.  That is a nonissue. ... He is not here."  (R. 465-66; *see also* R. 461-63).  Hindman now

claims in his 12th Ground (Civ. Doc. 1-5 at 16-22, Doc. 1-6 at 1-7) that his lawyer and the court

"lied" to him in open court as it related to Jones's whereabouts because "newly disclosed

documents ... clearly show[ ]," Hindman says, that the undersigned United States District Judge

and "gov[ernment] associates had informant Jones secretly tucked away in a fed[eral] prison ...."

(Civ. Doc. 1-5 at 17-18).  The "newly disclosed documents" to which Hindman refers are copies

of a criminal judgment and part of a docket sheet from the United States District Court for the

Eastern District of Tennessee showing that, in a case filed against Jones in December 2003, he

pled guilty to being a felon in possession of a firearm or ammunition and was sentenced to 188

months imprisonment in May 2005.  (*See* Doc. 1-11 at 33-36).

In his 12th Ground, Hindman argues that the failure of counsel and/or the court to call

Jones as a witness at trial and/or compel him to appear violated Hindman's Sixth Amendment

"confrontation rights."  (Civ. Doc. 1-6 at 6; *see also* Doc. 1-5 at 16).  In his 13th Ground,

Hindman contends that these same circumstances violated his equal protection and due process

rights under the Fifth and Fourteenth Amendments and amounted to "structural error."  (Civ.

Doc. 1-6 at 7).  His 35th Ground raises an associated claim of ineffective assistance of counsel.

(Civ. Doc. 1-9 at 10-11).

These claims are nonsense.  For starters, the documents that Hindman filed in this court in 2010 indicating that Jones was serving a federal sentence after having been convicted in a federal district court in another State in 2005 have no tendency to show that either Hindman's trial counsel or the undersigned district judge had any knowledge of Jones's whereabouts at the time of Hindman's trial in February 2007.  Instead, the record supports that defense counsel made efforts to locate Jones in the Tennessee state prison system, based on Hindman's own statements to his counsel that he believed that Jones was there serving a life sentence (*see also* R. 466), but those efforts were unsuccessful.

Moreover, Hindman completely and utterly fails to explain how he might have suffered even the slightest prejudice from the failure to have Jones testify at trial.  Indeed, having Jones on the stand at trial could have done nothing but seriously damage Hindman's case before the jury. That is, Hindman does not suggest even now that Jones had any knowledge or would provide any testimony to the effect that Hindman did not commit either of the Alabama bank robberies from August 2003 and August 2005 that were the subject of the charges against him in this court. Rather, Hindman says he wanted call Jones merely to "confront" him about the supposed "lies" he told in May 2003 that appeared in Healy's affidavit in support of a search warrant from April 2005.

Hindman apparently intended to rehash issues from the suppression hearing at trial. However, neither Healy nor anyone else testified at trial about Healy's affidavit, the associated search warrant, the ensuing search, or anything that Jones ever said.  Further, the matters that Hindman hints he wanted to raise with Jones only had to do with (1) the particular charges upon which Jones was being held by Tennessee authorities when he gave his statement, and (2)

Jones's statements related to his history of committing armed robberies with a host of enumerated associates, including Hindman.  Again, the jury knew nothing about the search warrant or Jones's statements, so the first matter above would have been entirely collateral and irrelevant to the issues in Hindman's trial.  And an inquiry into the second matter would have opened the door to a damaging exploration of Hindman's history of armed robbery, including his 1981 federal conviction for bank robbery, and that he had been suspected of committing other bank robberies that were the subject of the 2005 search warrant.  The jury was not otherwise aware of any of that damaging criminal history.  Accordingly, any failure by counsel to call Jones at trial was trial strategy, and more than sound at that, and thus not deficient performance.  *See Tanzi v. Sec'y, Fla. DOC*, 772 F.3d 644, 659 (11th Cir. 2014) ("Trial counsel's decision not to call a reluctant witness or one that might be more harmful than helpful might reasonably be considered sound trial strategy."); *Davis v. Kemp*, 829 F.2d 1522, 1538 (11th Cir. 1987) (holding that defense counsel's decision not to call character witnesses was valid strategic decision as calling such witnesses would have opened the door to allow the state to introduce evidence of defendant's bad character).

In the end, regardless of whether these claims might be construed as relying upon the Confrontation Clause or the Compulsory Process Clause of the Sixth Amendment, the Due Process Clause or equal protection principles of the Fifth Amendment, or a theory that counsel was ineffective, they are without merit and due to be denied.

### 9.   Concealment of Impeachment Evidence Related to Shropshire and Jones (14th Ground)

Hindman next asserts in his 14th Ground that the prosecution withheld impeachment information about Shropshire and Jones in violation of his due process rights.  (Civ. Doc. 1-6 at

8).  Hindman does not specify what information the prosecution allegedly withheld other than to say it was "impeaching information to the unlawful drug [and] firearms activities of informants Shropshire [and] Jones that also involved Agent Healy up to his ears and all involved in this case."  (*Id.*).  He then goes on to reference all the facts alleged in his 1st, 2nd, 3rd, and 12th Grounds.  (*Id.*).  The United States responds that Hindman has failed to demonstrate any prejudice.  (Civ. Doc. 13 at 32).  The court agrees.

The court would note at the outset that Hindman could not have suffered any prejudice at trial because neither Jones nor Shropshire testified.  The court has extensively reviewed and analyzed in detail Hindman's claims concerning the information contained in the search warrant application affidavit and concerning Shropshire, Jones, and Agent Healy.  The court has found that individually and collectively the information does not demonstrate any constitutional deprivation warranting relief regarding any pre-trial matter.  This claim is due to be denied on the merits.

### 10.    Claims Related to Wayne Watkins (15th, 16th, 34th Grounds)

Hindman raises several claims related to Wayne Watkins, a witness who did not testify at trial.  According to a statement that Watkins gave to Hindman's private investigator on December 20, 2006, Watkins resided in Elkmont and was out walking in the woods on the morning of the bank robbery on August 12, 2005, in the area not far from where the green getaway car was abandoned.  (*See* Doc. 1-18 at 12-16).  At that time, Watkins was looking for a spot to set up a deer stand when he saw a "tall, like slender fella" in his "late thirties [or] early forties," wearing blue coveralls, and carrying "some kind of bag," and moving "in a fast walk."  A short time later, after the other man had gone, police with bloodhounds came upon Watkins, ordered him to the ground, and told him he was under arrest for robbing the bank.  He was

66

subsequently placed in a patrol car, taken to the county jail, and interrogated about the robbery. After holding Watkins for 24 hours, however, the authorities released him.

Hindman now claims that Watkins appeared at the trial and that Hindman's trial counsel, Rick Burgess, spoke with Watkins at that time. Hindman further maintains Watkins observed Hindman in the courtroom and told Burgess that Hindman was not the man he saw walking in the woods on the day of the robbery. Despite that, Hindman says, Burgess declined to call Watkins as a witness and told him to go home. (*See* Civ. Doc. 1-6 at 20; *see also* Civ. Doc. 1-18 at 18-20). For his part, Burgess acknowledges that Watkins appeared on the morning of trial pursuant to a subpoena, and he also confirms that Watkins indicated that he could not identify Hindman as the man he saw in the woods. (Civ. Doc. 13-1 at 1). Burgess also admits that he declined to call Watkins as a witness. Burgess explains that he did so, however, because Watkins's description of the man he saw in the woods was consistent with Billy Don Harvey, Hindman's co-defendant who had pled guilty to the Elkmont robbery and who was going to testify against Hindman on behalf of the government. Accordingly, Burgess says, he believed that Watkins's testimony tended to bolster the government's theory of the case that Hindman and Harvey robbed the bank together and then ran into the woods following the robbery. (*Id.*). Counsel's trial strategy not to call Watkins was a reasonable one based on sound judgment and not deficient. *See Tanzi v. Secr'y, Fla. DOC*, 772 F.3d 644, 659 (11th Cir. 2014).

In his 15th Ground, Hindman argues that the government violated his due process rights under *Brady* by allegedly withholding exculpatory information about Watkins. (Civ. Doc. 1-6 at 9-21). Once a defendant requests the discovery of any favorable evidence material to either guilt or sentence, the prosecution's suppression of such evidence, whether in good or bad faith, violates due process. *Brady*, 373 U.S. at 87. However, no *Brady* violation occurred regarding

any information about Watkins.  No *Brady* violation occurs if the defendant knew of the

information or had equal access to obtaining it before trial.  *Downs v. Sec'y, Fla. DOC*, 738 F.3d

240, 259-60 (11th Cir. 2013); *Parker v. Allen*, 565 F.3d 1258, 1277 (11th Cir. 2009).

To that end, the record conclusively establishes that Hindman's attorneys were fully

aware of Watkins' existence and his role in the case prior to trial.  The government denies that it

suppressed any information about Watkins, insisting that he was discussed with Hindman's

attorneys on numerous occasions.  (Civ. Doc. 13 at 32).  The government also highlights that, the

day after the robbery, a newspaper account in the Decatur Daily referenced Watkins by name,

stating that he had been discovered in the woods and arrested by the Limestone Sheriff's

Department for carrying a pistol and that he was still being questioned about the robbery.  (Civ.

Doc. 13-2).

Finally, Hindman's own allegations and submissions doom this claim.  Hindman states

that he learned about Watkins "from the internet" and that he relayed the information to his then-

counsel, Bryce Callaway.  (Civ. Doc. 1-6 at 11; *see also id.* at 13).  That discovery of information

would have occurred no later than when Callaway was permitted to withdraw as Hindman's

counsel in July 2006, more than six months before trial.  (*See* Crim. Docket Entry dated July 24,

2006).  Further, Hindman has shown that his private investigator, Cook, met with Watkins and

took his statement on December 20, 2006, some eight weeks prior to trial.  (Civ. Doc. 1-18 at 12-

16).  Finally, Hindman's trial counsel, Burgess, acknowledged that he was fully aware of

Watkins, had him subpoenaed, and met with him on the morning of trial but ultimately decided

not to call him as a witness.  (Civ. Doc. 13-1 at 1).  The *Brady* claim is frivolous.

In his 16th Ground, Hindman appears to argue that the failure of his appointed attorneys

to call Watkins to testify at trial violated his right to "compulsory process."  (Civ. Doc. 1-6 at

22).  In his 34th Ground, Hindman cites that same failure or refusal constituted ineffective assistance of counsel.  (Civ. Doc. 1-9 at 7-9).  Both of these claims also fail.

First, the Sixth Amendment guarantees a criminal defendant the right "to have compulsory process for obtaining witnesses in his favor."  The crux of that right is that a criminal defendant is entitled to "the government's assistance in compelling the attendance of favorable witnesses at trial and ... to put before a jury evidence that might influence the determination of guilt." *Pennsylvania v. Ritchie*, 480 U.S. 39, 56 (1987).  The right also generally prohibits the government from obstructing the defense's ability to call a favorable witness, such as by hiding him out.  *See United States v. Henao*, 652 F.2d 591, 592 (5th Cir. Unit B 1981).

However, Hindman does not allege, and the record would in any event refute, that (1) the court ever refused to subpoena Watkins or to otherwise compel his attendance at trial, (2) that the government took some action that prevented Watkins from appearing at trial, or (3) that the court refused to allow him to testify.  Rather, Hindman's claim is that Watkins did appear at trial but defense counsel decided not to call him as a witness.  Such circumstances simply do not implicate any denial of the right to compulsory process.  *See Gov't of Virgin Islands v. Weatherwax*, 77 F.3d 1425, 1434 (3d Cir. 1996) (recognizing "that counsel's refusal to call a witness that his client had instructed him to call did not violate defendant's right to compulsory process") (citing *State v. Davis*, 506 A.2d 86, 92 (Conn. 1986)); *Watkins v. Nelson*, 430 F.2d 1311, 1312 (9th Cir. 1970) (defendant was not denied compulsory process based on his attorney's refusal to call a witness); *cf. United States v. Daniels*, 572 F.2d 535, 540 (5th Cir. 1978) (holding that defendant's confrontation clause rights were not violated where defense counsel refused to call a particular witness and, after the defense rested, the trial court declined a request by defendant himself to call the witness).

69

However, defense counsel's decision not to call a witness sometimes can support a claim of ineffective assistance under *Strickland*.  Nonetheless, determining which witnesses to call "is the epitome of a strategic decision," and is thus one that courts will seldom second guess.  *Rhode v. Hall*, 582 F.3d 1273, 1284 (11th Cir. 2009) (quoting *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995) (en banc)).  Here, counsel had ample reason to believe that calling Watkins might be more harmful that helpful: Watkins's testimony would suggest that he had seen Hindman's co-defendant, Harvey, in the woods on the morning of the Elkmont robbery, near the area where the green getaway car was found, and would tend to corroborate the prosecution's theory that Hindman and Harvey robbed the bank together and ran off into the woods to escape police pursuit.  Because not calling Watkins could be reasonably viewed as sound trial strategy, it did not amount to deficient performance under *Strickland*.[19]  *See Tanzi*, 772 F.3d at 659-60.  This claim is due to be denied.

### 11.   Impeachment of Billy May (17, 18th, 19th, and 37th Grounds)

Hindman next raises several claims in which he asserts that the government or the court or his own attorneys frustrated his efforts to "impeach" Billy May; May testified as a prosecution witness that he and Hindman together robbed the bank in August 2003, using a car that Hindman had directed May to steal and drive from Tennessee to Sand Rock, Alabama.  First, Hindman contends in his 17th Ground that the government violated *Brady* by withholding information to the effect that some government official, who Hindman suspects was FBI Agent Healy, allegedly offered to pay May in cash for information about May's past robberies, thereby giving May an incentive to lie about Hindman.  (Civ. Doc. 1-6 at 23-26, Civ. Doc. 1-7 at 1-2).

---

[19]The court would also note that the jury was, in fact, made aware by Deputy King that Watkins was discovered in the field by police and arrested on the morning of the robbery but was later released.  (R. 256-57).

In support, Hindman points to a copy of an excerpt of a redacted FBI Form 302 that the government furnished in discovery, which recounts a statement May gave on October 27, 2005. (Civ. Doc. 1- 18 at 23-24).  That FBI Form 302 indicates that May had stated that someone whose name was redacted on the document had "offered MAY $25,000 to provide him with information about his robberies in order to have [a] Rule 30[20] motion filed for a sentence reduction."  (*Id.* at 24).  In his 37th Ground, Hindman raises a related claim that his counsel was ineffective for refusing "to file any-thing (sic) about the blacked out name on the document." (Civ. Doc. 1-9 at 13).

The government has taken all the air out of this balloon, however, by showing that Hindman's suspicion that May had said that Healy or some other official offered to pay May $25,000, is simply unfounded.  The government filed an unredacted copy of the FBI Form 302 of May's statement.   (Civ. Doc. 13-3).  At the bottom of page 6, it states in relevant part that "JOHN SHROPSHIRE offered MAY $25,000 to provide him with information about his robberies in order to have a Rule 30 motion filed for a sentence reduction."  Shropshire was another member of the "Soddy Daisy Gang" of armed robbers, not a government agent.  Rather, at the time of May's statement, Shropshire was also in federal prison, and May was alleging that *Shropshire* had offered to pay May for information that Shropshire could use to obtain a federal sentence reduction for himself.  Accordingly, nothing supports that Healy or any other government official offered to pay May for anything, including testimony against Hindman.

The court would also note that defense raised no objection or request to reveal the redacted name provided in discovery.  The government also claims, without contradiction, that it

---

[20]This appears to be an incorrect reference in the FBI 302.  The correct Rule is "35", dealing with reductions premised upon cooperation after sentencing.  *See* Fed. R. Crim. P. 35.

allowed defense counsel to review all the un-redacted FBI 302's in this case prior to trial.  (Civ. Doc. 13 at 34).  This issue also was not raised on appeal.  These claims are due to be denied.

In his 18th Ground, Hindman argues that his constitutional rights were violated because someone with the government or one of his attorneys allegedly destroyed court records or other documentation that supposedly showed that May had a 24-year-old conviction for perjury, thereby preventing Hindman's trial counsel from impeaching May with that conviction.  (Civ. Doc. 1-7 at 3-7).  This claim also lacks merit.

This issue was litigated at trial (R. 430-44), and the court ruled that Hindman could not ask May about his alleged perjury conviction because Hindman had insufficient evidence to establish its existence.  To support this claim, Hindman has provided an copy of an undated "true bill" that a Tennessee grand jury returned against May for "fraudulently obtaining a driver's license."  (Civ. Doc. 1-18 at 22).  Hindman still fails to show, however, that May was actually *convicted of perjury*, in connection with that indictment or otherwise.  Hindman also offers nothing to support his claim that his counsel or anyone with the prosecution took any action designed to conceal any evidence of May's prior convictions.  To the extent that Hindman complains about the court's ruling on this matter, such a claim is defaulted because it was not raised on direct appeal.

What is more to the point is that whether Hindman was able to impeach May with an alleged 24-year-old perjury conviction could have had no impact whatever on the verdict.  May told the jury that he was then in federal prison serving a 182-month sentence on weapons and drug charges.  (R. 405-06).  On cross-examination, Hindman's counsel brought out that May had also been convicted of grand larceny, concealing stolen property on multiple occasions, interstate transportation of stolen motor vehicles, a host of drug possession offenses, several assaults,

battery, reckless driving, several weapons-possession charges, driving under the influence, theft, vandalism, manufacture of methamphetamine, and had once been charged with vehicular manslaughter.  (R. 421-26).  He acknowledged that he had been a drug addict for about 30 years (R. 424-25) and that he had approached the government with his story while in prison and was now testifying against Hindman in hopes that he might get a reduction on the federal sentence he was serving.  (R. 427-28).  No one could mistake May for a choirboy.

Given the jury's awareness of May's ignominious history and obvious potential bias, any suggestion that his credibility might have depended upon whether he was also shown to been convicted of "perjury" in connection with renewing his driver's license in the early 1980's is absurd.  This claim is due to be denied.

Finally, in his 19th Ground, Hindman claims that the court and his own counsel violated his constitutional rights by "block[ing]" him from "exposing to the jury" tape recordings of May speaking from prison on the telephone to other individuals.  (Civ. Doc. 1-7 at 8-20).  According to Hindman, the recordings would show that May's claim that he talked with Hindman from Federal Prison was not the truth.  (*Id*. at 8-10).  Instead, the call would show that a woman or other family members were talking to May about the information that was later attributed to Hindman.  (*Id*. at 10-15).

Hindman does not dispute that the recordings were known to Hindman at trial. Accordingly, any claim concerning the failure of this court to allow their use could have been raised on direct appeal.  These claims, therefore, are procedurally defaulted and barred from further review absent a showing of cause and prejudice.

To the extent that Hindman argues his appellate counsel was ineffective in failing to raise this claim, the court disagrees.  Nothing in the transcripts is relevant to the substantive testimony

that May offered at trial.  Additionally, while some of the material in the transcripts might

constitute impeachment, it is minor; Hindman has not demonstrated any prejudice to excuse his

default or to support a claim of ineffective assistance of counsel.[21]  This claim is due to be denied

as well.

### 12.    "Surprise Testimony" from FBI Agent Healy (20th Ground)

At trial, three defense witnesses testified to provide Hindman with an alibi for the Sand

Rock, Alabama, bank robbery on August 1, 2003.  Those witnesses were Hindman's son, Heath

Hindman ("Heath") (R. 519-30); Heath's friend, Scotty Beam (R. 511-19); and Heath's cousin,

Dustin Golden (R. 530-36).  They each stated that, on the day of that robbery, Hindman was in

Signal Mountain, Tennessee, helping them prepare a stock car that Heath was going to drive the

next day in a race in Georgia.   During the course of that testimony, Beam and Heath both

acknowledged that Heath raced a stock car with the number "91" on it and that such was also the

number of a car that Hindman himself used to race.  (R. 516, 529-30).  Thereafter, the court

allowed FBI Agent Paul Healy to testify in rebuttal, over defense objection, that "91" was the

FBI's classification code for bank robbery investigations.  (*Id*. at 547-48).

In his 20th Ground, Hindman contends that his constitutional rights to due process and

equal protection were violated by the admission of this "surprise testimony" by Healy.  (Civ.

Doc. 1-7 at 20-22).  In an amendment to his motion to vacate dated July 9, 2010, Hindman

further contends that Healy's testimony violated both Fed. R. Evid. 404(b) and "Home-Land

Security Laws of The United States" and constituted "knowing perjury."  (Civ. Doc. 12 at 7-10).

---

[21]By way of example, in one of the transcripts, May is quoted as telling an FBI agent that he knew
Hindman, "but I ain't done nothing with him."   (Civ. Doc. 1-19 at 22).

74

These claims are procedurally defaulted because Hindman could have but did not argue them on direct appeal.  And Hindman cannot overcome that default because he cannot show cause or prejudice.  First, a matter of public record shows that, contrary to Hindman's assertion, "91" is, in fact, the FBI's numeric classification for bank robbery.  *See*

http://www.archives.gov/research/ investigations/fbi/classifications/091-bank-robbery.html.

Second, Healy's testimony regarding FBI classification codes is not character evidence, so Rule 404(b) is inapplicable.  And third, and most fundamentally, no possibility exists that the admission of Healy's testimony regarding this single ambiguous fact had a material impact on the verdict given the totality of the evidence presented.  Even assuming *arguendo* that the admission of the testimony might have been improper, any error was patently harmless.  These claims are due to be denied.

### 13.    Claims Related to DNA Expert (21st and 38th Grounds)

In these claims, Hindman contends that his constitutional rights were violated because he was "denied" a DNA expert or because his counsel failed to call such an expert to counter the government's DNA analyst who testified that Hindman's DNA was a match to a sample obtained from the mask used in the August 2005 bank robbery.  (Civ. Doc. 1-7 at 23-24).  To the extent that Hindman suggests he was "denied" a DNA expert, this claim is defaulted because it was not raised on direct appeal.  In any event, this claim is undone by Hindman's own allegation that Magistrate Judge Ott approved the defense's request for a DNA expert.  (Civ. Doc. 1-7 at 23).  Indeed, Hindman's trial counsel, Burgess, states in his affidavit that the defense actually did hire a DNA expert, Dr. Ron Action.  (Civ. Doc. 13-1 at 1).  Thus, the court did not "deny" Hindman a DNA expert.

Hindman also claims that Burgess was ineffective in failing to call a DNA expert at trial.

(Civ. Doc. 1-9 at 14).  However, Hindman cannot show deficient performance or prejudice.

Burgess stated that Dr. Action advised that his findings were consistent with those of the FBI

laboratory, *i.e.*, *that the DNA on the mask was Hindman's*.  (Civ. Doc. 13-1 at 1).  Accordingly,

Burgess decided not to call him as a witness.  (*Id.*).  That decision was obviously reasonable trial

strategy, not deficient performance.  "*Strickland* does not enact Newton's third law for the

presentation of evidence, requiring for every prosecution expert an equal and opposite expert

from the defense."  *Harrington v. Richter*, 562 U.S. 86, 111 (2011).  "In many instances

cross-examination will be sufficient to expose defects in an expert's presentation.  When defense

counsel does not have a solid case, the best strategy can be to say that there is too much doubt

about the State's theory for a jury to convict."  *Id.*  That is what defense counsel reasonably

attempted to do here.  Further, Hindman's intimation that some other, unidentified DNA expert

might have given testimony favorable to the defense is entirely speculative.  This claim is

without merit.

### 14.    Alleged Defects in the Indictment (22nd and 24th Grounds)

In his 22nd and 24th Grounds, Hindman contends that his conviction is invalid because of

alleged defects in the indictment.[22]  (*See* Civ. Doc. 1-7 at 25-26, Civ. Doc. 1-8 at 1-6, Civ. Doc.

1-8 at 8).  Hindman first asserts that the "indictment on its face is multiplicit[ous] [and]

duplicit[ous]."  (Civ. Doc. 1-7 at 25).  Second, he claims that the "indictment contains serious

defects of incorrect false [and] perjured claims, that go directly to the material elements of the

offense," such that the indictment "failed to properly inform [him] of the charges against him."

(*Id.* at 25-26).  In support, Hindman points out that Count Three charged him with carrying or use

---

[22]Technically, Hindman was tried under a superceding indictment (Crim. Doc. 24), which is referred to
herein simply as the "indictment."

of a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A), while identifying the underlying crime as "Armed Bank Robbery, as charged in *Count One* of this Indictment." (Crim. Doc. 24 at 3-4 (emphasis added)). Hindman observes, however, that Count One charges him with unlawful interstate transportation of a stolen motor vehicle, not with bank robbery. (Civ. Doc. 1-8 at 3-4). Likewise, Hindman notes that Count Five also charged him with a violation of 18 U.S.C. § 924(c)(1)(A), identifying the underlying crime as "Armed Bank Robbery, as charged in *Count Three* of this Indictment." (Crim. Doc. 24 at 4 (emphasis added)). Hindman here similarly complains that Count Three is itself another charge of carrying or use of a firearm during and in relation to a crime of violence, not bank robbery.

Hindman has procedurally defaulted these claims because he could have but did not raise them on direct appeal. The court would note that insofar as Hindman suggests that the alleged defects in the indictment he cites give rise to claims that are "jurisdictional" in nature (Civ. Doc. 1-7 at 25) and thus might be raised at any time, he is simply wrong. *See United States v. Seher*, 562 F.3d 1344, 1359-60 (11th Cir. 2009) (claim that an indictment was duplicitous does not implicate jurisdictional issues); *United States v. Pacchioli*, 718 F.3d 1294, 1307-08 (11th Cir. 2013) (claims alleging indictment was multiplicitous and lacked factual specificity were not jurisdictional); *see also United States v. Cotton*, 535 U.S. 625, 629-31 (2002) (defects in indictment do not deprive the court of power to adjudicate case).

Hindman also cannot overcome his default of these claims based on the alleged ineffectiveness of his appellate counsel in failing to raise them because Hindman cannot show either deficient performance or prejudice under *Strickland*. Hindman makes a bald claim that his indictment was duplicitous and multiplicitous. Hindman uses these terms imprecisely, and the

77

defects he describe do not meet the legal standard of duplicitous or multiplicitous.

"A count in an indictment is duplicitous if it charges two or more separate and distinct offenses." *United States v. Schlei*, 122 F.3d 944, 977 (11th Cir. 1997); *see also* Fed. R. Civ. P. 12(b)(3)(B)(i). "A duplicitous count poses three dangers: '(1) A jury may convict a defendant without unanimously agreeing on the same offense; (2) A defendant may be prejudiced in a subsequent double jeopardy defense; and (3) A court may have difficulty determining the admissibility of evidence.'" *Id.* (quoting *United States v. Wiles*, 102 F.3d 1043, 1061 (10th Cir. 1996)). By contrast, an "indictment is multiplicitous, and thus violates the Double Jeopardy Clause of the Fifth Amendment, 'if it charges a single offense in more than one count.'" *United States v. Ford*, 784 F.3d 1386, 1392 (11th Cir. 2015) (quoting *United States v. Williams*, 527 F.3d 1235, 1241 (11th Cir. 2008)); *see also* Fed. R. Civ. P. 12(b)(3)(B)(ii). Hindman wholly fails to explain how his indictment was either duplicitous or multiplicitous, and the court concludes that it was neither. Accordingly, appellate counsel was not ineffective in failing to raise such frivolous arguments.

Hindman's claim regarding the errors in Counts Three and Five of the indictment fares no better. True, the "carrying-or-use-of-a-firearm" charges in Counts Three and Five were based upon, and referred to, underlying bank robberies that were ostensibly set forth in Counts One and Three. And Hindman is correct that Counts One and Three did not charge him with bank robbery; instead, the bank robbery charges, alleging violation of 18 U.S.C. § 2113, were in Counts Two and Four. (*See* Crim. Doc. 24 at 2, 4). Ultimately, however, these were mere scrivener's errors that did not affect the validity of the indictment. *See United States v. Baldwin*, 774 F.3d 711, 724 (11th Cir. 2014).

Hindman has also conveniently ignored that this issue was addressed in the pretrial stage

of the proceedings and resulted in the government's filing of a bill of particulars.  (*See* Crim.

Docs. 43, 57, 59, & 62).  That filing clarified any ambiguity by stating expressly that the

underlying crime of violence in Count Three was the robbery of the Dekalb Bank on or about

August 1, 2003, in Sand Rock, Alabama, and that the underlying crime of violence in Count Five

was the robbery of the Citizens Bank on or about August 12, 2005, in Elkmont, Alabama.  (Crim.

Doc. 24-2; Crim. Doc. 62).  Hindman fails to show how he was prejudiced at trial, and his

appellate counsel was not ineffective for failing to raise this issue, either.  Hindman is not

entitled to relief on this claim.

### 15.    Variance/Sufficiency of the Evidence on Count One (22nd Ground)

In his 22nd Ground Hindman also argues that a variance existed between the indictment

and the proof at trial and/or that the evidence was insufficient to convict on Count One. That

count charged:

> On or about the 2nd day of July, 2003, within the Northern District of Alabama,
> the defendant, JIMMY DOYAL HINDMAN, did unlawfully transport in interstate
> commerce a stolen motor vehicle, that is, a 1985 Chevrolet Caprice, from the
> State of Tennessee to the State of Alabama, knowing the same to be stolen, in
> violation of Title 18, United States Code, Section 2312.

(Crim. Doc. 24 at 1).

Hindman makes two distinct arguments.  First, he emphasizes that while the evidence at

trial showed that the vehicle in question was stolen on July 1st or 2d, 2003, it was not actually

transported from Tennessee to Alabama until August 1, 2003.  (Civ. Doc. 1-7 at 26, Civ. Doc. 1-

8 at 1).  Second, he claims that his conviction under Count One is due to be reversed because the

evidence at trial, in the form of testimony by his co-defendant, Billy May, showed that the motor

vehicle at issue was both stolen and driven from Tennessee into Alabama by May himself, not

Hindman.  (Civ. Doc. 1-8 at 1-3; *see also* R. 407, 410, 421).

Hindman's trial counsel raised both of these issues in support of a verbal motion for judgment of acquittal on Count One at the conclusion of the prosecution's case-in-chief.  (R. 447-48).  However, the court rejected those arguments, and they were not presented on direct appeal but could have been.  Therefore, these claims are procedurally defaulted absent a showing of cause and prejudice, and Hindman cannot show either one, on any claim.

Starting with his argument about the date of the offense, it amounts to a claim of a variance between the indictment and the proof at trial.  *See United States v. Young*, 39 F.3d 1561, 1566 (11th Cir. 1994).  Such a variance does not call for a reversal, however, unless it was material and substantially prejudiced the defendant.  *Id.*

When the government charges that an offense occurred "on or about" a certain date, as here, the defendant is on notice that the charge is not limited to the specific date or dates set out in the indictment.  *United States v. Reed*, 887 F.2d 1398, 1403 (11th Cir. 1989).  Proof of a date "reasonably near" the specified date and within the statute of limitations and before the indictment is sufficient.  *Id.*; *see also United States v. Pope*, 132 F.3d 684, 688-89 (11th Cir. 1998).

Hindman complains about a discrepancy of only one month, and he does not set forth facts or otherwise explaining *how* his defense was actually prejudiced.  Under established Circuit precedent, Hindman fails to demonstrate that the variance might have entitled him to a new trial.  *See Reed*, 887 F.2d at 1403 (approximate one-month variance in date of offense alleged in indictment and date proved at trial was not "impermissible variance" so as to require new trial); *United States v. Champion*, 813 F.2d 1154, 1168 (11th Cir. 1987) (prosecution's use of the "on or near" designation with respect to a date in the indictment cured possible one month variance

between date alleged in indictment and date proved at trial); *United States v. Harrell*, 737 F.2d 971, 981 (11th Cir. 1985) (variance between February date alleged in indictment and proof at trial that charged offense occurred "during the summer" held non-prejudicial). This claim is without merit.

The court now turns to Hindman's other claim, related to May's testimony that he, not Hindman, actually stole the car and drove it from Tennessee to Alabama. Count One charged Hindman with a violation of 18 U.S.C. § 2312 (Crim. Doc. 24 at 1), which provides:

> Whoever transports in interstate or foreign commerce a motor vehicle, vessel, or aircraft, knowing the same to have been stolen, shall be fined under this title or imprisoned not more than 10 years, or both.

Hindman appears to assume that unless the government proved at trial that he himself stole the car or that he personally drove or otherwise personally transported it across state lines, he could not be convicted under Count One. Hindman again is wrong.

Whoever "aids, abets, counsels, commands, induces or procures" the commission of an offense against the United States is punishable as a principal. 18 U.S.C. § 2(a). Furthermore, whoever "willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal." 18 U.S.C. § 2(b). These provisions apply to allow a conviction of § 2312 under an aiding-and-abetting theory. *See, e.g., United States v. Lambert*, 580 F.2d 740, 742 (5th Cir. 1978); *United States v. Ewing*, 480 F.2d 1141, 1142 (5th Cir. 1973); *Smith v. United States*, 403 F.2d 689, 690-91 (5th Cir. 1968). Even if, as here, an indictment does not specifically cite 18 U.S.C. § 2, a defendant may be convicted of aiding and abetting under the statute so long as the evidence supports it and the jury is instructed on it. *See United States v. Tucker*, 402 F. App'x 499, 501-02 (11th Cir. 2010) (citing *United States v. Walker*, 621 F.2d 163, 166 (5th Cir. 1980); *United States v. Martin*, 747 F.2d

81

1404, 1407 (11th Cir. 1984)); *see also United States v. Sosa*, 777 F.3d 1279, 1292 (11th Cir. 2015); *United States v. Hornaday*, 392 F.3d 1306, 1311 (11th Cir. 2004).

In this case, the court charged the jury that, to find Hindman guilty on Count One, it had to find that the government had proven beyond a reasonable doubt that he "transported *or caused to be transported* in interstate commerce a stolen vehicle as described in the indictment. . . . Whether the defendant himself stole the car or someone else stole the car does not matter.  But to find the defendant guilty, you must find that the defendant transported it *or caused it to be transported* in interstate commerce with knowledge that the car had been stolen."  (R. 564-65) (emphasis added).  The "caused to be transported" language above amounts to an instruction on aiding-and-abetting liability under 18 U.S.C. § 2.  *See Bearden v. United States*, 304 F.2d 532, 534-35 (5th Cir. 1962), *vacated on other grounds*, 372 U.S. 252 (1963).

In this vein, May testified that, leading up to the Sand Rock robbery on August 1, 2003, Hindman instructed May and a mutual friend of theirs, Mitchell Berry, to steal a car because Hindman "had a bank picked out in Fort Payne, Alabama, that [they] would go rob at the first of the month if [they] could get a car and go in a stolen car."  (R. 407).  Pursuant to that arrangement, May and Berry then went to Nashville, stole a white Chevrolet Caprice, and brought it back to eastern Tennessee, storing it at the house of Billy Don Harvey, Hindman's co-defendant on the 2005 bank robbery charge.  (*Id*.).  About a week later, Hindman told May that they would try to rob the bank on July 15th, but they still did not get ready in time, so they put the job off again, until August 1st.  (*Id*.).  On the morning of August 1st, May and Hindman both traveled from Tennessee to Alabama in separate vehicles, with May driving the stolen Chevy and Hindman driving a green Ford Taurus; they used those vehicles to effectuate the robbery of the bank.  (R. 410, 421).

As the court ruled at trial in response to Hindman's motion for judgment of acquittal on Count One (*see* R. 447-48), May's testimony was sufficient to allow the jury reasonably to infer that Hindman "caused" the Chevrolet to be transported in interstate commerce, knowing that it was stolen, thus supporting his guilt under an aiding-and-abetting theory. *See Smith*, 403 F.2d at 690-91; *see also United States v. Burks*, 678 F.3d 1190, 1197 (10th Cir. 2012); *United States v. Sopczak*, 742 F.2d 1119, 1121-22 (8th Cir. 1984). Hindman is not entitled to relief on this claim.

### 16.      Alleged Defects in the Jury Instructions (23rd Ground)

In his 23rd Ground, Hindman makes a conclusory assertion that the circumstances regarding alleged defects in the indictment, outlined in his 22nd Ground, also demonstrate that the "court gave the jury ... false and incorrect instructions [and] information." (Civ. Doc. 1-8 at 7). However, this claim also was not raised on direct appeal and is defaulted, and Hindman cannot show cause or prejudice. For the reasons stated above, Hindman's 22nd Ground for relief is meritless. Further, "when the jury instructions, taken together, accurately express the law applicable to the case without confusing or prejudicing the jury, there is no reason for reversal even though isolated clauses may, in fact, be confusing, technically imperfect, or otherwise subject to criticism." *United States v. Gibson*, 708 F.3d 1256, 1275 (11th Cir. 2013) (quoting *United States v. Beasley*, 72 F.3d 1518, 1525 (11th Cir. 1996)); *see also United States v. Cochran*, 683 F.3d 1314, 1319 (11th Cir. 2012) (reversal based on a challenged jury instruction is appropriate only if the instruction "misstated the law or misled the jury to the prejudice of the objecting party" and the court, considering the instructions as a whole, is left with a "substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations." (citations omitted)). Here, Hindman fails to identify any specific errors in the court's jury instructions or how he was materially prejudiced. Therefore, this claim is due to be rejected.

### 17.    Post-Trial Confiscation of Legal Materials (25th Ground)

Hindman next contends that his constitutional rights were violated based upon allegations that, in about November 2007, while he was in custody following his trial, agents of the United States Marshals Service and the Lee County, Alabama, Sheriff's Department confiscated some 2,000 pages of Hindman's legal documents related to this case.  (Civ. Doc. 1-8 at 9).  However, Hindman fails to explain how such action caused him to suffer prejudice, particularly given that he was represented by appointed counsel in his then-pending direct appeal.

Further, the court concludes that this claim does not challenge the validity of Hindman's federal sentence and is thus not a ground for post-conviction relief cognizable under § 2255.  *See Preiser v. Rodriguez*, 411 U.S. 475, 498 (1973) (recognizing that the plaintiff in *Houghton v. Shafer*, 392 U.S. 639 (1968), who claimed "that prison authorities had violated the Constitution by confiscating legal materials which he had acquired for pursuing his appeal," was not "challenging the fact or duration of his physical confinement itself" and was not "seeking immediate release or speedier release from that confinement – the heart of habeas corpus."); *Armstrong v. Coleman*, 2012 WL 1252570, at *4 (E.D. Pa. Feb. 10, 2012) (holding that habeas proceeding under 28 U.S.C. § 2254 was not proper vehicle to hear state prisoner's claim concerning the confiscation of his legal materials because such had "no bearing on the substantive determinations of the legality of his incarceration"); *Kilgore v. Drew*, 2008 WL 4694532 (D.S.C. Oct. 22, 2008) (holding that claim by federal prisoner related to confiscation of legal documents was properly brought as civil rights claim, not as habeas claim); *Stewart v. Clark*, 2008 WL 612292, at *1 (D. Utah Mar. 5, 2008) (petitioner's "claims about legal access during incarceration—i.e, lack of a law library and confiscation of legal materials—are improperly brought in this habeas case").  Hindman is not entitled to § 2255 relief on this claim.

### 18.      Error in Pre-Sentence Investigation Report (26th Ground)

Hindman alleges in his 26th Ground that he is entitled to have his conviction vacated because the Pre-Sentence Investigation Report erroneously states that his prior conviction for bank robbery, entered in the United States District Court for the Western District of North Carolina in 1981, was the result of a guilty plea, when in fact he was found guilty by a jury. (Civ. Doc. 1-8 at 10-11; *see also* Civ. Doc. 1-13 at 33).  Hindman further insists summarily that he "still claims his innocence" as it relates to that prior conviction.  (Civ. Doc. 1-8 at 10).  The Government concedes that Hindman was found guilty by a jury and did not plead guilty to the 1981 bank robbery charge.  (Civ. Doc. 13 at 42).  Hindman, however, offers no hint regarding how this error in the pre-sentence report might have resulted in any prejudice to him at sentencing.  This claim is without merit.

### 19.      Venue Claims (27th and 28th Grounds)

In these claims, Hindman complains that holding his trial in Birmingham, rather than in Huntsville or Gadsden, violated his rights under both the Constitution and federal statutes.  He argues that, since the 2005 bank robbery occurred in Limestone County, Alabama, located within the Northeastern Division of the Northern District of Alabama,[23] 28 U.S.C. § 81(a)(2), he had to be tried for that offense in that division.  (Civ. Doc. 1-8 at 12-13).  He likewise insists that because the 2003 bank robbery occurred in Cherokee County, in the Middle Division, 28 U.S.C. § 81(a)(6), he had to be tried for that offense in that division.  (Civ. Doc. 1-8 at 14-17).  He posits, therefore, that holding his trial in Birmingham, Jefferson County, in the Southern

---

[23]Hindman erroneously states in his § 2255 motion that Limestone County is in the "North-Western Division."  (Civ. Doc. 1-8 at 12).

Division,[24] 28 U.S.C. § 81(a)(3), violated his rights under the 5th, 6th, and 14th Amendments, as well as "Title 28 U.S.C. [§] 114 - now 1393, 1441," which he says "prohibits the moving of criminal trials from the division the crime took place in to a division the crime did not take place in, .... unless a defendant request[s] such" a transfer.  (Civ. Doc. 1-8 at 13; *see also id.* at 15-16).  In support, Hindman emphasizes that he not only did not request such a move, he opposed it by a *pro se* motion.  (*Id.* at 13).

These claims are both procedurally defaulted, because they were not raised on appeal, and entirely misguided.  Federal Rules of Criminal Procedure18 provides that a defendant must be prosecuted in the district where the offense was committed.  No statute or rule or Constitutional right requires that a defendant be tried in the same *division* within that district where the crime occurred.  *See United States v. Betancourt*, 734 F.2d 750, 756 (11th Cir. 1984) (stating, "The Sixth Amendment provides a defendant with the right to a trial 'by an impartial jury of the State and district' where the crime was committed, but there is no constitutional right to trial within a division").  Rather, a district court has discretion to fix the place of a trial in any division within the district.  *United States v. Merrill*, 513 F.3d 1293, 1304 (11th Cir. 2008).

Hindman's statutory arguments fail as well because they are based on code provisions that have not existed for many decades.  Former 28 U.S.C. §§ 114, 1393, and 1441 once required that "prosecutions" be had in the division in which the offense was committed, *see Salinger v. Loisel*, 265 U.S. 224 (1924); however, Rule 18, Fed. R. Crim. P., was amended in 1966 to delete the requirement that trial be held in the division in which the crime was committed.  *See United States v. Joyner*, 494 F.2d 501, 504 (5th Cir. 1974); *see also* 2 C. Wright, A. Leipold, et al., Fed.

---

[24]Hindman erroneously states that Birmingham is located in the "Southeastern Division." (Civ. Doc. 1-8 at 12).  This judicial district, however, has no such division.

Prac. & Proc. Crim. § 301 (4th ed.) ("The most important general venue provision is no longer in the statute books because it is now covered by Rule 18."). The statutory sections cited by Hindman now have nothing to do with these issues. Section 114 of Title 28 establishes North Dakota as a single judicial district. Section 1393 was repealed entirely in 1988, *see King v. CVS Caremark Corp.*, 2012 WL 3029909, at *2 (N.D. Ala. July 20, 2012), and when it last existed, it created divisional venue requirements for civil cases, not criminal cases, while § 1441 is a removal statute that also applies only to civil cases. *See United States v. Alvarado*, 647 F.2d 537, 539 n.4 (5th Cir. Unit A June 1981); *United States v. Hoover*, 922 F.2d 845 (table), 1991 WL 1518, at *3 (9th Cir. Jan. 9, 1991). These claims are without merit.[25]

### 20. Failure to Call Additional Alibi Witnesses (29th, 30th, 31st, and 32nd Grounds)

In these claims, Hindman argues that his trial counsel was ineffective because he refused or otherwise failed to call additional witnesses to buttress Hindman's alibi for the Sand Rock, Alabama, bank robbery; that robbery occurred on Friday, August 1, 2003, at approximately 9:45 a.m., central time. The primary evidence linking Hindman to that robbery was the testimony of Billy May. He acknowledged at trial that he was serving a 182-month federal sentence on gun and drug charges and that he agreed to testify in hope that he might get a reduction on his sentence. (*See* R. 406-07, 429-30). According to May, he and Hindman drove from Tennessee to Alabama on that morning and robbed the bank together. May further recounted that following the robbery, Hindman drove to a remote rural location about 15 miles away and left May there with the money, guns, and masks from the robbery. Hindman, May said, then drove back later

---

[25]The court would also note that, although Hindman's trial was held in Birmingham, the jurors were selected from a pool of jurors from the Northeastern Division as if the case were tried in Huntsville belying any claim of prejudice. (*See* Civ. Doc. 1-4).

that evening between 10:00 and 11:00 p.m. and retrieved May and the robbery paraphernalia from the woods.

At trial, defense counsel called three witnesses in an effort to provide Hindman with an alibi for this robbery.  Those witnesses were Hindman's son, Heath (R. 519-30); Heath's friend, Scotty Beam (R. 511-19); and Heath's cousin, Dustin Golden (R. 530-36).  In sum, their testimony was essentially that, from sometime before noon eastern time, or 11:00 a.m. in Alabama, on Friday, August 1, 2003, until about 2:00 o'clock in the morning on Saturday, August 2nd, Hindman was with them at the house where Heath lived with his mother and stepfather in Signal Mountain, Tennessee.  Specifically, they claimed that Hindman was in the basement garage helping them prepare a stock car that Heath was going to race the next day in Lanier, Georgia.

Hindman now contends that trial counsel was ineffective because he failed to call four additional witnesses to testify to this same alibi, namely, Heath's mother, Joan Helton ("Joan") (29th Ground, Civ. Doc. 1-8 at 19-21); Joan's sister, Liz Allen ("Allen") (30th Ground, Civ. Doc. 1-8 at 22-24); Joan's husband, Curtis Helton ("Curtis") (31st Ground, Civ. Doc. 1-8 at 25-26, Civ. Doc. 1-9 at 1); and another man named Curtis Lowe ("Lowe") (32nd Ground, Civ. Doc. 1-9 at 2-3).

In support, Hindman proffers substantially similar affidavits from Joan, Allen, and Curtis, which all appear to have been handwritten by Hindman himself and signed by the respective affiants. (Civ. Doc. 1-21 at 2-17).  Joan and Allen each claim that they "could have positively testified" that Hindman "could not have been down in Ala[bama]" on August 1, 2003, "robbing any bank" with May.  (*Id.* at 3-4, 7, 9).  Joan further says she "could have positively testified" that Hindman was in the basement garage of the house she owned with her husband Curtis in

Signal Mountain and that Hindman was working on Heath's race car "thru - out (sic) the day, and late up - into (sic) the night Friday, Aug[ust] 1, 2003, getting ready for a next day race in [Georgia]."  (*Id.* at 4).  Allen likewise asserts that she was at Joan and Curtis's house "most of the day" on August 1, 2003, and that she "could have testified" that Hindman was there "thru-out (sic) the day" helping get Health's race car ready.  (*Id.* at 8-9).

In his affidavit, Curtis advises that he "could have disputed most" of May's testimony, stating that Hindman "positively could not have been down in" Alabama late on that Friday night "picking up Bill May after some Ala[bama] bank robbery."  (Civ. Doc. 1-21 at 13).  Rather, Curtis claims that he "could have testified" that he arrived at his home in Signal Mountain on "Friday after-noon (sic)," that Hindman and the others were there working on Heath's car, and that they continued to do so "until very late Friday night ..., probably after 2:00 a.m."  (*Id.* at 14-15).  While there is no affidavit from Lowe, Curtis alleges that "his good friend" Lowe, "a life time big-truck driver," was also at the house until "very late" that Friday night.  (*Id.* at 16).

Finally, Joan, Allen, and Curtis each state that they attended Hindman's trial and were told by Hindman's attorney, Burgess, that he was not going to use them as witnesses because Hindman did not want them to testify.  (*Id.* at 2-3, 6-7, 9, 12-13, 16).  Curtis similarly relates that Lowe told him that Burgess had called Lowe before the trial and told him not to come because he was not needed as a witness.  (*Id.* at 16-17).  For his part, Hindman insists that he did not tell Burgess that he did not want Joan, Allen, or Curtis to testify and that Burgess had told him (Hindman) that he (Burgess) was not going to call them because they did not know anything important and did not want to testify.  (Civ. Doc. 1-8 at 21, 24).

In response, Burgess stated that he spoke to each of the four individuals at issue and that he decided not to call them to the stand because they had indicated to him that they could not

provide an alibi for Hindman on the day of the robbery.  (Civ. Doc. 13-1 at 1-2).  In particular,
Burgess said that Joan told him before the start of the trial that she remembered Hindman being
at the race in Georgia, but that was the day after the robbery, and that she "had no specific
recollections of seeing [him] on the day of the robbery."  (*Id.* at 1).  Likewise, Burgess said Allen
remembered Hindman "going to the races but could not be more specific and had no specific
recollection of [him] on the day of the robbery."  (*Id.* at 2).  Burgess alleges that Joan's husband
Curtis told Burgess that he recalled Hindman "going to races in Lanier but didn't recall specific
years [and] provided no alibi information."  (*Id.*).  Burgess claims that Lowe also "just stated that
he sometime attended races with [Hindman]" but had no other information and that he never told
Burgess that "he was with ... Hindman on the day of the robbery."  (*Id.*).  Finally, Burgess states
that, to the extent that these individuals may now be claiming that they told him something
different than the above, he expressly denies that they did so.  (Civ. Doc. 13-1 at 1-2).

 Insofar as Burgess's version of what he was told by Joan, Curtis, Allen, and Lowe in
relation to their inability to give alibi testimony might be credited, then Burgess's failure to call
them as witnesses obviously would not have been deficient performance under *Strickland*, nor
could it have resulted in prejudice.  *See McCoy v. Newsome*, 952 F.2d 1252, 1261-62 (11th Cir.
1992) (holding that because counsel determined after investigating alibi defense that alibi
witnesses could not state specifically when they saw petitioner on the night of the offense,
petitioner was not prejudiced by attorney's failure to subpoena witnesses); *Thomas v. Estelle*, 588
F.2d 170, 171 (5th Cir. 1979) (holding that petitioner was not denied effective assistance of
counsel by failure to call putative alibi witnesses since the testimony of those witnesses, who
could not account for petitioner's activities during the time of the alleged assault, would not have
aided him at trial); *Ball v. United States*, 271 F. App'x 880, 884 (11th Cir. 2008) ("The record

shows that Ball's counsel spoke with the alibi witnesses and knew what they would have said on the stand.  Nothing in these witnesses' affidavits suggests that they told trial counsel something that would have indicated to any reasonable attorney that further interviews were required.").

In this regard, the court notes that while Joan, Allen, and Curtis now assert in their affidavits that they "could have positively testified" to an alibi for the day of the robbery, they do not expressly and unambiguously deny Burgess's claims about what they had *told him* at or leading up to the trial, *i.e.*, that they did not have any specific recollection of seeing Hindman on the day of the robbery.  The court reviews claim alleging ineffective assistance of counsel from the perspective of defense counsel based on the facts "as they were known to counsel *at the time of the representation*."  *Caderno v. United States*, 256 F.3d 1213, 1217 (11th Cir. 2001) (quoting *United States v. Teague*, 952 F.2d 1525, 1535 (11th Cir. 1992) (emphasis original in both *Caderno* and *Teague*)).  Thus, even if these witnesses now say they "could have testified" to an alibi, strictly speaking, if the information they communicated to Burgess at the relevant time led him reasonably to believe that they could not or would not do so, then Burgess plainly could not be faulted for failing to call them.  *See Gissendaner v. Seabolt*, 735 F.3d 1311, 1326-27 (11th Cir. 2013) (counsel was not ineffective in failing to elicit testimony from additional witnesses where "none of those witnesses could adequately explain why they did not tell counsel what they knew or had heard" about the relevant issue).

Even assuming that the affidavits of Joan, Allen, and Curtis sufficiently imply that, contrary to Burgess's claim, they (and Lowe) *told* Burgess that they were able and willing to testify to an alibi in the manner they now suggest, this claim still founders on *Strickland*'s prejudice prong.  As outlined above, counsel called three witnesses, Heath, Beam, and Golden, who testified at trial that Hindman was working on Heath's car with them in Signal Mountain,

91

Tennessee, sometime on the day of the bank robbery in Sand Rock, Alabama.  The proposed

testimony of Joan, Allen, Curtis, and Lowe is to the same effect and thus cumulative.  In

addition, like the three trial alibi witnesses, the additional four now proffered had relationships or

connections to Hindman that would have likely caused the jury to view them as predisposed to be

sympathetic to his cause.  Their testimony also has no direct relation to Hindman's guilt as it

relates to the other charged bank robbery, in 2005.

In light of the evidence of guilt presented at trial, and given that the jury necessarily found

the similar alibi testimony of three trial witnesses to be unconvincing, the court finds no

reasonable probability that the outcome of Hindman's trial would have been different even if the

additional witnesses had testified.  *See Boyd v. Comm'r, Ala. DOC*, 697 F.3d 1320, 1340 (11th

Cir. 2012) (no reasonable probability of a different outcome where "new" alibi evidence was

"contradictory, cumulative, and weak when compared to the evidence adduced at trial"); *Walker*

*v. Sec'y, Fla. DOC*, 495 F. App'x 13, 17 (11th Cir. 2012) (habeas petitioner failed to show that

the result of his trial would have been different had counsel called his brother to testify, where

brother's testimony would have been cumulative of other alibi testimony); *Wellington v. Moore*,

314 F.3d 1256, 1262-63 (11th Cir. 2002) (declining to find a reasonable probability calling

defendant's parents as alibi witnesses would have changed the outcome of trial); *Lewis v. Cain*,

444 F. App'x 835, 835-36 (5th Cir. 2011) (holding defendant was not prejudiced by counsel's

failure to call alibi witness where alleged testimony would have been relevant only to two of four

charges, would have been cumulative of earlier testimony, and witness's credibility could have

been questioned based on her close family relationship with defendant); *O'Neal v. Province*, 415

F. App'x 921, 925 (10th Cir. 2011) (concluding defense counsel's failure to present cumulative

alibi evidence did not prejudice the defendant); *cf. Hall v. Thomas*, 611 F.3d 1259, 1293 (11th

Cir. 2010) (counsel's performance was not deficient in failing to call witnesses where their

testimony would have been cumulative of the multiple alibi witnesses presented at trial).  This

claim is due to be denied.

### 21.    Refusal to Allow Allen to Testify at Post-Trial Hearing on Motion for Appointment of New Counsel (33rd Ground)

Hindman next argues that the court infringed his rights under the Sixth Amendment when

Magistrate Judge Ott declined to allow Liz Allen to testify at a hearing in August 2007, between

the verdict and sentencing, regarding Hindman's motion for appointment of new trial counsel to

replace Burgess.  (*See* Civ. Doc. 1-9 at 4-6).  Magistrate Judge Ott subsequently denied

Hindman's motion on behalf of the court (*see* Crim. Doc. 130), although Hindman was later

appointed new counsel on direct appeal.  (*See* Crim. Docket Entries dated10/03/2007 and

10/09/2007).  Hindman filed no objections to the order and did not raise the matter on direct

appeal.  Accordingly, this claim is procedurally defaulted.  Additionally, Hindman has not

demonstrated any prejudice from the purported error.  This claim is due to be denied.

### 22.    Failure to Call "Photograph Expert" (39th Ground)

In his 39th Ground, Hindman alleges that trial counsel, Burgess, was ineffective for not

calling a "Photograph Expert" to counter the Elkmont Bank eye witness bank tellers about the

build and height of the bank robbers.  (Civ. Doc. 1-9 at 15-19).  Specifically, Hindman alleges

that "a Mr. Stenson, an Ass[istant] Professor in Forensic Photograph[y] at the University of

Michigan," told Hindman's investigator, Richard Cook, that if he were given a "true photo" or a

"film-negative" of Hindman and the robber, then Stenson could "defintely say 'if' [the robber] is

'not' Def[endant] Hindman."  (*Id.* at 15).  Hindman also notes that Magistrate Judge Ott

approved the use of court funds for the retention by the defense of a "forensic expert."  (*See*

Crim. Docket Entry dated 01/05/2007).

Counsel was not ineffective in this instance for a number of reasons.  First, as discussed previously in connection with counsel's decision not to call a DNA expert, whether to call a particular expert witness is generally a matter of trial strategy that courts will rarely second guess. Here, Hindman's vague allegations do not clearly state that Stenson or some other "photograph expert" actually would have been able to provide testimony that was materially favorable to the defense.  Hindman's speculation that a missing witness would have been helpful is insufficient to carry the burden of a habeas petitioner endeavoring to make out a claim of ineffective assistance. *See Johnson v. Alabama*, 256 F.3d 1156, 1187 (11th Cir. 2001); *see also Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978) ("[C]omplaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative.").

Likewise, while Hindman makes much of the eyewitnesses' height and weight estimates and the appearance of the robbers in still security photos, such evidence was not key to the prosecution's efforts to place Hindman at the scene.  Rather, the government relied primarily upon the testimony of Hindman's co-defendant, Billy Don Harvey who said he robbed the bank with Hindman; the eye witness testimony of Deputy Randy King who identified Hindman as the driver of the getaway car; the testimony of Luther Rievely who gave the getaway car to Hindman for repairs a few days before the robbery; and DNA evidence that put Hindman in the getaway car and wearing a mask used in the robbery.  As a result, Hindman cannot show either that trial counsel's performance was deficient in failing to retain and call a "photograph expert" or that such failure resulted in prejudice within the meaning of *Strickland*.  This claim is due to be denied.

94

### 23.    Limitations on Pro Se Filings (40th Ground)

In this claim, Hindman alleges that the undersigned judge and Magistrate Judge Ott violated his Sixth Amendment right to effective assistance of counsel by restricting his *pro se* filings while he was represented by court appointed counsel.  (Civ. Doc. 1-9 at 20-24).  The United States responds that the claim is without merit and not cognizable under § 2255.  (Civ. Doc. 13 at 49).  The court agrees.

"It is settled law that a defendant has the right to represent himself in a criminal trial and that he has the right to the assistance of counsel."  *United States v. Daniels*, 572 F.2d 535, 540 (5th Cir. 1978).  He does not, however, have the right to "'hybrid representation,' partly by counsel and partly by himself."  *Id.*  "[T]he right to counsel and the right to proceed *pro se* exist in the alternative."  *United States v. LaChance*, 817 F.2d 1491, 1498 (11th Cir. 1987).

This claim is without merit.  Hindman consistently was represented by court appointed counsel.  When necessary, Magistrate Judge Ott appointed  new counsel.  Additionally, he has not alleged, much less demonstrated, any prejudice.

### 24.    Ineffective Assistance of Appellate Counsel (41st Ground)

In his 41st and final Ground for relief, Hindman argues generally that his appointed appellate counsel was ineffective.  (Civ. Doc. 1-9 at 22-24).  More specifically, he complains that his appellate counsel never communicated with him during the direct appeal process and raised only two issues that Hindman considers frivolous.  Hindman contends rather that his counsel should have, raised all of the claims that Hindman raises in his § 2255 motion.  This court has addressed the ineffective assistance of appellate counsel claims previously regarding the individual claims advanced by Hindman.  As detailed above, Hindman cannot establish that his appellate counsel was ineffective because, at a minimum, he cannot demonstrate prejudice under

*Strickland* to any of his would-be appellate claims. Stated more precisely, because non of his claims asserted here have merit, appellate counsel cannot be deficient for failing to assert them on direct appeal. This claim is without merit.

## III.   CONCLUSION

Based on the foregoing, the court concludes that Hindman's motion under 28 U.S.C. § 2255 to vacate his federal sentence is due to be **DENIED**. (Civ. Doc. 1, Crim. Doc. 153). Further, because the motion does not present issues that are debatable among jurists of reason, the court concludes that a certificate of appealability is also due to be **DENIED**. *See* 28 U.S.C. § 2253(c); *Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000); Rule 11(a), Rules Governing § 2255 Proceedings. The court will enter a separate Final Judgment.

**DONE** and **ORDERED** this the 15th day of July, 2015.


KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE